1  *Cohen Kennedy Dowd & Quigley*
2  *The Camelback Esplanade I*
3  *2425 East Camelback Road • Suite 1100*
   *Phoenix, Arizona 85016*
4  *Telephone 602•252•8400  Facsimile 602•252•5339*
   *E-mail filings@ckdqlaw.com*
5
6  Ronald Jay Cohen (003041) Email: rcohen@ckdqlaw.com
   Daniel G. Dowd (012115) Email: ddowd@ckdqlaw.com
7  Daniel P. Quigley (009809) Email: dquigley@ckdqlaw.com
   Gabriel R. Aragon (024649) Email: garagon@ckdqlaw.com
8  Betsy J. Lamm (025587) Email: blamm@ckdqlaw.com
     Attorneys for Aerotec International, Inc.
9
                **IN THE UNITED STATES DISTRICT COURT**
10
                   **FOR THE DISTRICT OF ARIZONA**
11

12  AEROTEC INTERNATIONAL, INC., an       )    No: _____
    Arizona corporation,                  )
13                                         )
                                           )    **COMPLAINT**
14                  Plaintiff,             )    (1) Violations of Sherman Act (15
                                           )        U.S.C. §§ 1,2); Robinson-Patman
15  vs.                                    )        Act (15 U.S.C. § 13);
                                           )    (2) Violations of Ariz. Rev. Stat. § 44-
16  HONEYWELL INTERNATIONAL, INC., a       )        1401 *et. seq.*;
    Delaware corporation,                  )    (3) Tortious Interference with
17                                         )        Contractual Relations and
                                           )        Prospective Business Advantage;
18                  Defendant.             )    (4) Injurious Falsehood;
                                           )    (5) Deceptive Trade Practices
19                                         )
                                           )    (Jury Trial Demanded)
20                                         )
                                           )
21  _____)

22
           Plaintiff Aerotec International, Inc. ("Aerotec"), for its Complaint against Honeywell
23
    International, Inc. ("Honeywell"), alleges as follows:
24
                     **PARTIES, JURISDICTION AND VENUE**
25
26         1.      Aerotec is an Arizona corporation with its principal place of business in Phoenix,
27
    Arizona.   Aerotec is in the business of providing the full range of maintenance, repair and

overhaul ("MRO") services on small gas turbine engines called auxiliary power units ("APUs") and on APU components. Aerotec is certified by the United States Federal Aviation Administration ("FAA") and other regulatory bodies throughout the world to provide APU MRO services.

2.      Honeywell is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Morristown, New Jersey. Honeywell is engaged in a wide variety of business activities and a global provider of aircraft engines, APUs, integrated avionics, equipment, systems and services for aircraft manufacturers, airlines, businesses and general aviation, military, space and airport operations. Honeywell's Air Transport and Regional strategic business group is based in Phoenix, Arizona.

3.      This action arises from Honeywell's unlawful and anticompetitive conduct in violation of federal and state antitrust statutes and state common law. Aerotec brings this action for treble damages and for permanent injunctive and other relief against Honeywell resulting from Honeywell's violations of, inter alia, the Sherman Act, 15 U.S.C. §§ 1, 2 and the Robinson-Patman Act, 15 U.S.C. § 13. This Court has subject matter jurisdiction over these claims pursuant to 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331 and 1337. Aerotec also asserts claims for Honeywell's violations of Arizona's antitrust statutes, tortious interference with Aerotec's contractual relations and prospective business advantage, deceptive trade practices and for injurious falsehood. This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367. The Court has personal jurisdiction over Honeywell because of Honeywell's substantial, continuous presence in this District and its purposeful activities directed toward and committed in this District.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Honeywell transacts business in this District and has engaged in conduct in this District out of which a substantial part of the events giving rise to Aerotec's claims occurred.

## DEMAND FOR JURY TRIAL

5.     Aerotec respectfully demands a trial by jury on all claims asserted in this Complaint.

## NATURE OF THE ACTION

6.     This action arises out of the anticompetitive, abusive and illegal conduct of Honeywell in its position as the dominant firm at all levels of the APU segment of the aviation industry.

7.     Aerotec provides APU MRO services (hereinafter "APU repairs") for domestic and international aircraft owners and operators.  When not subjected to Honeywell's oppressive actions described in this Complaint, Aerotec is a formidable competitor specializing in providing efficient repairs for APUs manufactured by Honeywell that are of higher quality and lower cost than provided by Aerotec's competitors, including Honeywell and Honeywell-"authorized" (i.e., favored) service providers.  However, as Honeywell wields monopoly control and power over the manufacture and distribution of replacement parts for Honeywell APUs, Aerotec is forced to rely on Honeywell – its largest and fiercest competitor – for the supply of parts that are absolutely necessary to compete to provide most APU repairs.

8.     Through the myriad acts detailed in this Complaint, Honeywell has calculated and is carrying out a plan to use its market power as the dominant original equipment manufacturer ("OEM") of APUs and manufacturer of APU replacement parts to unlawfully

3

restrain, if not destroy, competition and harm customers in the market for APU repairs. Honeywell's intentional actions directed toward Aerotec include, among other actions, overt price discrimination, refusals to deal, denials of access to essential parts, repair data, technical information and required tooling, unlawful bundled pricing penalties, unlawful tying arrangements, exclusionary long-term exclusive dealing agreements and failures to reasonably or responsibly supply ordered and paid-for Honeywell APU replacement parts.  Honeywell's actions illicitly eliminate competition in the APU repair market, severely damage and threaten the very existence of Aerotec, and cause customers (i.e., those who own, operate or lease jet aircraft with APUs) to purchase APU repairs from Honeywell or a Honeywell-affiliated repair provider that these customers would prefer to purchase elsewhere.  Honeywell's actions are deliberate and have severely and wrongfully restrained the ability of equally or more efficient competitors within the APU repair market to compete to the ultimate detriment of customers and the marketplace.  Honeywell's willful conduct is the essence of anticompetitive behavior and is the exact harm the antitrust laws seek to prevent.

9.     Honeywell's actions violate the Sherman and Robinson-Patman Acts, Arizona antitrust and common laws, have injured free market competition and customer choice in the APU repair industry, and have caused devastating injury to Aerotec.  Aerotec brings this action to recover the substantial damages it has incurred as a result of Honeywell's actions and to enjoin Honeywell from further unlawful, anticompetitive conduct that destroys vibrant, merit-based competition in the APU repair marketplace.

4

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### Overview of the APU Industry

10.     An APU is a small turbine engine that powers critical auxiliary functions on many jet aircraft, including providing pneumatic (air) power to start the primary engines and for the environmental control system, and electrical power for the plane's flight controls and avionics. APUs may also be used in emergency situations to provide electrical and pneumatic power for the aircraft in the event a primary engine fails during flight.   After the primary engines and landing gear, an APU is one of the most expensive components on a jet aircraft.   The price of a new APU on a commercial aircraft ranges from approximately $500,000.00 to almost $2 million.

11.     Within the APU industry, APUs are typically classified as either "old generation" or "new generation."   "Old generation" generally refers to APUs that are installed on aircraft that are no longer in production but remain in active service.   "New generation" generally refers to more modern APUs used on aircraft that continue to be in active production.   New generation APUs often contain more electronic components than old generation APUs.   As older airframes are retired, old generation APUs are also retired from use and new airframes are built using new generation APUs.

12.     The APU industry generally consists of the following participants: (i) OEMs; (ii) manufacturers/distributors of replacement parts for APUs; (iii) APU repair providers (including some airlines which have the capability to service APUs); and (iv) end-user customers that purchase, own, operate or lease aircraft with APUs.   OEMs manufacture APUs that are installed in jet aircraft which customers purchase from aircraft manufacturers.   OEMs

5

(or their licensees) and a small number of FAA-certified aftermarket replacement parts manufacturers compete for the sale of APU replacement parts to repair providers. Finally, some OEMs (e.g., Honeywell), OEM-affiliated service centers (often referred to by the OEM as "authorized" service centers or "ASCs"), independent repair providers such as Aerotec, and some airline in-house repair facilities compete to provide APU repairs.

13.     Any manufacturer that intends to produce APUs or replacement parts for APUs in the United States must first obtain FAA design and production approval by satisfying stringent standards designed to ensure an acceptable level of quality and safety. Similarly, any business that intends to provide repairs for APUs must first meet strict standards imposed by, and obtain certification from, the FAA for the repairs to be provided. The ratings provided by the FAA to the repair provider define and limit the services that may be provided and, again, are designed to ensure an acceptable level of quality and safety.

14.     The ability to provide APU repairs, and thereby to compete in that market, is dependent upon the repair provider's access to APU replacement parts. Replacement parts must be approved by the FAA and are manufactured by the APU OEM, an OEM licensee or, in limited instances, by a third-party with Parts Manufacturer Approval ("PMA") from the FAA for the specific APU replacement part in question. To obtain PMA authority from the FAA, the manufacturer must demonstrate that the aftermarket part meets or exceeds the safety and quality standards applicable to the equivalent OEM part. PMA replacement parts are typically less expensive than OEM replacement parts; however, PMA parts are available for only a very small percentage of the total parts that comprise an APU due to substantial market barriers to entry and expansion. These barriers include the research, development and capital investment

expenditures necessary to develop the replacement part, the stringent requirements that must be met to obtain FAA approval for the PMA part, the difficulty in achieving customer acceptance to use a non-OEM replacement part in APU repairs, and the difficulty in achieving the volume of orders necessary to attain economies of scale so the PMA manufacturer can reasonably compete with the OEM. These obstacles are more pronounced for replacement parts for new generation APUs. Moreover, Honeywell, the dominant APU OEM, has artificially made these barriers even more difficult for a third-party PMA manufacturer to overcome by entering a variety of affiliate contracts with select APU repair providers. In return for access to Honeywell replacement parts, the repair providers pay royalties to Honeywell and agree to purchase APU replacement parts exclusively from Honeywell and not from PMA makers. These exclusive dealing contracts help maintain Honeywell's monopoly control over replacement parts for Honeywell APUs and stifle the development of competition in that market, which, in turn, fortifies Honeywell's market power in the APU repair services market. The existence of these barriers to entry in the APU replacement parts market is confirmed by the small percentage of APU replacement parts for which PMA parts are available.

15.     The ability to provide APU repairs is further dependent upon access to the technical data necessary to perform the repairs and ensure continued airworthiness of the APU. OEMs are required to maintain such technical data and make it available to appropriately FAA-certified repair stations. Further, in some cases an APU repair service provider may devise its own alternative repair process and seek approval from an FAA-designated engineering representative ("DER") to use that process in connection with APU repairs. As detailed below, Honeywell has impeded competition in the APU repair market by unlawfully restricting access

to or removing required technical data from its repair manuals, forcing independent APU repair providers to develop DERs and causing airline customers to not do business with anyone who uses non-OEM (i.e., DER) repairs.

**Honeywell's Dominance at Each Level of the APU Industry**

16.     Honeywell is one of the largest participants in the aviation industry.  Honeywell is a leading manufacturer and distributor of a broad range of aircraft engines, APUs, integrated avionics and equipment systems, and provider of related repairs and maintenance services for many types of aircraft.  By the end of 2008, Honeywell had approximately 128,000 employees worldwide and 58,000 within the United States.  Honeywell generated more than $36 billion in net sales in 2008, with its aerospace segment alone generating more than $12 billion. Honeywell is the dominant OEM, replacement parts supplier and repair provider within the APU industry.

*APU Original Equipment Manufacturer*

17.     Honeywell is by far the dominant OEM for new APUs.   Honeywell manufactures and supplies APUs for many of the best-selling commercial aircraft, including aircraft manufactured by Boeing and Airbus.   Honeywell controls the market for the manufacture and sale of APUs and has an approximately 80% share of the installed base of commercial and general aviation aircraft APUs.  Honeywell's primary competitor in the APU OEM market is United Technologies, which possesses a substantially smaller share of the market than Honeywell.

18.     When an aircraft on which a Honeywell APU will be installed is purchased, Honeywell routinely solicits and secures from the new customer – before other repair providers

are even aware of the transaction – a multi-year, exclusive APU service agreement.  These Honeywell service agreements take several forms.  For example, Honeywell often agrees to provide APU replacement parts and repairs at a fixed rate per hour of operation.  These agreements are known in the aviation industry as "power by the hour" ("PBTH") maintenance service agreements.  Other agreements Honeywell enters with new aircraft buyers include flat rate, time and material, and "not to exceed" time and material APU repair agreements.  Aircraft purchasers entering these exclusive agreements are prohibited from using non-Honeywell APU replacement parts or obtaining repairs from anyone other than Honeywell for the duration of the agreements, thereby foreclosing a substantial portion of the APU repair market from competing repair providers and impeding the development of viable alternatives to using Honeywell replacement parts.  Aerotec is reliably informed that to induce customers to enter these exclusive PBTH and related maintenance service agreements, Honeywell offers substantially reduced prices for Honeywell APU replacement parts and repair services as well as delivery priority for parts.

*APU Replacement Parts Manufacturer*

19.     Honeywell dominates the manufacture of replacement parts required to maintain, repair and overhaul Honeywell APUs, which, as noted above, constitute nearly 80% of the APUs in use.  Honeywell either manufactures APU replacement parts or licenses third-party manufacturers to do so pursuant to precise proprietary specifications provided by Honeywell.  These parts bear the Honeywell name.  Honeywell stringently controls the use and distribution of such replacement parts.  As noted above, the alternative to Honeywell replacement parts, FAA-approved third-party PMA parts, are available for only a small percentage of the total

number of replacement parts needed for Honeywell APUs. In its position as the OEM, Honeywell controls the technical information and tooling necessary to service Honeywell APUs so that they operate properly and safely.

*APU Repair Provider*

20.     Honeywell also is the dominant provider of APU repairs. Honeywell has full-scale APU repair facilities in Phoenix, Arizona, Raunheim, Germany, and Singapore. Honeywell aggressively pursues engagements to provide airlines with APU repairs through exclusive, multi-year service agreements (e.g., PBTH agreements). In addition, Honeywell enters Authorized Service Center ("ASC"), Storefront and similar affiliate parts supply agreements with non-Honeywell repair providers. Aerotec is reliably informed that pursuant to these affiliate agreements with other repair facilities, Honeywell provides, among other benefits, substantial price reductions on Honeywell replacement parts and parts delivery priority to the now Honeywell-affiliated repair providers. In return, Honeywell receives, inter alia, royalties and the repair providers' agreements to not use PMA parts and DER repairs. Through the royalties, Honeywell effectively shares in the profits earned by the affiliate's provision of APU repair services. Aerotec competes directly for APU repair work with Honeywell's own repair operations, these Honeywell-affiliated and favored repair providers, independent repair providers and airlines that have their own repair facilities.

**Aerotec's Role in the APU Industry: A First-Rate Repair Facility**

21.     Founded in 1991, Aerotec is an FAA-certified Repair Station (Repair Station No. UMCR407K) and has received its Class 1 (mechanical) and Class 2 (electrical) Accessory ratings. Aerotec is authorized by the FAA and specializes in providing the full range of repair

services for Honeywell and United Technologies APUs.  In addition to its FAA certifications, Aerotec has been approved by the regulatory bodies of 11 foreign countries to perform APU repairs.  Aerotec's APU repair facility in Phoenix, Arizona staffs over 100 employees and trained repair personnel, maintains a full range of specialized equipment, tooling and testing capabilities, and supports comprehensive maintenance, repair and overhaul services for APUs and APU accessories.

22.    Aerotec is capable of, and authorized to provide, repairs for the full spectrum of Honeywell-manufactured APUs, from old generation models such as the GTCP36, GTCP85, GTCP660 and TSCP700, to the 131, 331 and RE220 series of new generation Honeywell APUs.

23.    With lawful access to APU replacement parts, Aerotec's technical competency, advanced repair capabilities and efficient operational structure have enabled it to provide airline customers with high-quality, lower-cost APU repairs.  Until Honeywell unleashed its barrage of anticompetitive actions, Aerotec's level of business in the APU repair industry had steadily increased since it was founded nearly two decades ago.  Through its dedication to superior customer service, Aerotec was successfully competing with the largest participants in the APU repair market, including Honeywell and Honeywell "authorized" (i.e., affiliated) repair providers.  And until the actions of Honeywell described in this Complaint, Aerotec earned significant growth and success, with its revenues rapidly increasing from $10 million in fiscal year 2004 to a height of $35 million in fiscal year 2008.  Multiple Aerotec customers have reported that Aerotec's repairs substantially improve the overall performance and maintenance cycle of the customers' APUs, as measured by increases in the "mean time between removal"

11

("MTBR") of the APUs.  This, in turn, has led to substantial reductions in the customers' APU repair-related costs.

24.     Similarly, when provided with lawful access to APU replacement parts, Aerotec's repair services result in substantial cost savings to customers as compared to Aerotec's competitors, including Honeywell.  Aerotec's operational efficiencies and development of specialized repair processes offer customers a cost-effective alternative of repairing certain APU components or systems, rather than automatically resorting to replacement with OEM or PMA parts.  The combination of Aerotec's ability to reduce the number of shop visits over the life of an APU (by increasing MTBR) and reduce the cost per visit results in a substantial reduction in the customer's total APU repair costs and, absent Honeywell's anticompetitive and unlawful misconduct, makes Aerotec a vibrant, formidable competitor of Honeywell in the APU repair market.

**The Relevant Markets and Honeywell's Market Power**

25.     As relevant to Aerotec's claims, there are several distinct relevant markets within the aviation industry relating to APUs.  These markets include, but are not limited to: (i) the design, manufacture and sale of APUs; (ii) the design, manufacture and sale of replacement parts for Honeywell APUs; and (iii) the provision of APU repair services.

*The APU Market*

26.     APUs constitute a distinct relevant market, separate from the manufacture of other aircraft components or systems.  APUs provide unique functions, such as pneumatic and electrical power, which are vital to the operation of jet aircraft and cannot be reasonably performed by other aircraft components or systems.  An APU is a critical aircraft component

*Cohen Kennedy Dowd & Quigley*

and is included on the Minimum Equipment List for an aircraft, i.e., the APU must be operational for the aircraft to be permitted to fly (subject to FAA-authorized 10 day maintenance deferrals).

27.     Honeywell has monopoly power in the APU market.  Honeywell possesses the dominant market share of APUs sold across all segments of the aviation industry, with an approximately 80% share of the installed base of commercial and general aviation APUs. Honeywell's substantial share of the APU market, coupled with significant barriers to entry and expansion by other firms, solidifies Honeywell's monopoly power in this market.  These barriers include the cost and expense of developing the technology to manufacture a reliable APU, obtaining FAA approval for the new APU, establishing the performance record of the APU such that aircraft manufacturers would be willing to use the new entrant's APU in the aircraft design (rather than a Honeywell or United Technologies APU), achieving economies of scale such that the new entrant could viably compete with Honeywell in the manufacture of APUs, and overcoming Honeywell's pervasive brand power for APUs in the aviation industry. Honeywell's dominant market share and these entry barriers make it exceedingly difficult for a new rival to enter the APU market or for an existing competitor to expand its APU manufacturing base.

28.     The geographic scope of the APU market is global.  This is evidenced by, among other commercial realities, the fact that there are only a few APU manufacturers located throughout the world and jet aircraft owners and aircraft manufacturers located throughout the globe purchase APUs from these APU manufacturers.

*The Honeywell APU Replacement Parts Market*

29.     Replacement parts for Honeywell APUs are a distinct relevant market. Competitors in this industry include Honeywell and its licensed sub-manufacturers, and PMA manufacturers of aftermarket replacement parts for Honeywell APUs. The replacement parts necessary to maintain, repair or service Honeywell APUs are unique and there are no reasonable substitutes for the use of APU parts in connection with APU repair work. Purchasing a new APU is not a reasonable substitute for purchasing replacement parts to repair an APU because it is far more cost-effective to replace broken parts rather than the entire engine and because of the limited availability of new APUs for this purpose. Further, as replacement parts used in an APU repair must be FAA-approved for that application, parts used in other, non-APU aircraft components or systems cannot reasonably substitute for APU replacement parts. APU repairs, alone, also do not reasonably substitute for the use of APU replacement parts. For example, some customers purchase APU repair services without replacement parts, depending on the condition of the APU; whereas, other customers (e.g., airlines who service their own APUs) purchase replacement parts without purchasing repair services. As such, customers distinguish, demand and purchase APU replacement parts separately from other discrete aircraft components, parts and services.

30.     The full catalog of parts designed to maintain, repair and overhaul Honeywell APUs comprises this distinct relevant market. Ready access to all replacement parts is critical to enable APU repair providers to meet customer expectations regarding Honeywell APU repairs, turnaround time, and the overall performance and safety of repaired APUs and, thus, to compete in the repair market. Further, except for limited standard hardware, the parts

14

necessary to maintain, repair and overhaul a Honeywell APU must be designed, manufactured and authorized for use on the specific Honeywell APU. Because of the significant differences in designs, technologies and types of replacement parts for APUs manufactured by other OEMs, those parts are not reasonable substitutes and cannot be used in providing repairs on Honeywell APUs. For example, replacement parts for United Technologies' APUs (whether produced by United Technologies or a PMA manufacturer) cannot be used on a Honeywell APU. As such, customers distinguish, demand and purchase replacement parts designed to maintain, repair and overhaul Honeywell APUs separate and distinct from replacement parts designed for or used with other APU brands. Moreover, customers seeking repairs of Honeywell APUs reasonably expect the repair providers will be able to obtain all parts necessary to complete the needed repairs.

31.    Honeywell has monopoly power in the relevant market of replacement parts required to maintain, repair and overhaul Honeywell APUs. Honeywell, either itself or through licenses with sub-manufacturers, controls approximately 90% or more of the manufacture, distribution and sale of replacement parts for Honeywell APUs. The limited availability of alternatives, i.e., PMA replacement parts, to the use of Honeywell APU replacement parts, combined with the significant barriers to entry and expansion in the replacement parts market for Honeywell APUs (e.g., regulatory and certification requirements, research and development expenses, capital investment, user reluctance, economies of scale, Honeywell's pervasive brand power and Honeywell's control over parts-related technical repair information and tooling), fortify and maintain Honeywell's monopoly power in the relevant market of replacement parts

15

for Honeywell APUs.  The presence of severe barriers to entry and expansion is confirmed by the small market share PMA manufacturers have attained.

32.     The geographic scope of the market for replacement parts for Honeywell APUs is global.  Honeywell APUs are used in aircraft located throughout the world and the need for replacement parts for a Honeywell APU can occur anywhere on the globe.   Given the importance of an operable APU to aircraft operations and air safety, the massive expense associated with an aircraft grounded because of a broken APU and the relatively minimal expense of shipping replacement parts, purchasers look globally for necessary parts.

*APU Repair Market*

33.     The provision of APU repairs is a separate relevant market within the APU industry, distinct from the markets for APUs and for Honeywell APU replacement parts described above.  Participants in this services market include Honeywell, repair providers affiliated with Honeywell pursuant to parts supply, pricing or similar agreements (i.e., ASCs, Storefronts), airline in-house repair facilities that compete for third-party repair work, and independent (i.e., non-Honeywell affiliated) APU repair providers such as Aerotec.  Although some airlines perform repairs only for APUs used in their own fleets of aircraft, this limited group of self-servicing airlines is appropriately excluded from the relevant APU repair market because they do not compete as rivals for other APU repair work.

34.     APU repairs are a separate relevant market as there are no reasonable substitutes for this service.  Repairing APUs requires specialized training, tooling, technical repair data and information, equipment and regulatory approval.  Because of their highly specialized and regulated nature, APU repairs are not reasonably substituted by or interchangeable with other

types of aviation repair services.  Further, purchasing an entirely new APU or APU replacement parts alone are not reasonable substitutes for the specialized training, tooling, equipment, technical repair data and regulatory certification necessary to provide APU repairs.  Some APUs need repairs and not replacement parts.  Moreover, even for a broken APU that requires replacement parts, parts are not a reasonable substitute for repairs, which must, by definition, be performed to install the parts, perform the corrective work and test the repaired APU for return to service.  As such, customers distinguish, demand and purchase APU repairs separately from other repair services or APU replacement parts alone.

35.     Honeywell has monopoly power in the relevant market of APU repairs as indicated by its high market share and substantial barriers to entry and expansion in that market.  Honeywell possesses the predominant share of the APU repair market within the aviation industry pursuant to its exclusive, long-term PBTH, "not to exceed" and similar APU maintenance service agreements entered with many airline customers when new aircraft are purchased or delivered, and Honeywell's large volume of APU repairs performed on a spot basis or pursuant to an aftermarket service agreement (all of which remove a substantial share of the APU market from rival competition).

36.     In addition to possessing a dominant share of the APU repair market, substantial barriers to entry and expansion reinforce Honeywell's monopoly power to predatorily control that market.  A firm must have sophisticated training, tooling, equipment, data and personnel, along with FAA approvals and ratings, to enter or expand in the APU repair market.  Additional barriers include customer reliance on the reputation and experience of incumbent repair providers, Honeywell's unique ability as the APU OEM to capture significant market

17

share for repair work from customers through manufacturer warranties and long-term service agreements entered when the aircraft is sold (which severely limit the opportunities of rivals or new entrants to win business), the required capital investment, the difficulty in achieving the economies of scale required to reasonably compete with Honeywell, Honeywell's pervasive brand power in the aviation and APU industries, and Honeywell's control over, and restriction of access to, the technical repair information and tooling necessary to provide repairs. Honeywell's monopoly power for APU repairs is further evident and fortified by the fact that Honeywell's rivals have far smaller market shares than Honeywell and, thus, are far less able to react to and constrain Honeywell's anticompetitive actions.  And, by entering contracts with affiliated repair providers that prohibit the use of PMA parts, Honeywell impairs the ability of PMA manufacturers to develop and serve as viable alternative sources of APU replacement parts to independent repair providers, and thereby solidifies Honeywell's control over the APU repair market.  Honeywell uses its monopoly power and the existence of substantial market-related barriers to engage in exclusionary conduct that severely impairs rivals and forecloses competition on the merits.

37.    The geographic scope of the APU repair market is global.  The APU repair market includes APU repair providers located throughout North America, South America, Europe, the Middle East, the Pacific Rim and other parts of the world that all compete for the APU repair work of customers who are also located throughout the world.  An APU is a vital component of many aircraft.  Moreover, the expense associated with an aircraft grounded because of a broken APU is enormous, and the cost of APU repair services often exceeds $250,000.00 per shop visit.  Based on these economic realities, customers select APU repair

providers on the basis of turnaround time, overall expense and quality, not on the relatively minimal expense incurred or saved by selecting a service provider based on geographic proximity. As a result, the area of effective competition where customers identify sources of APU repairs is global in nature.

## HONEYWELL'S ANTICOMPETITIVE CONDUCT

38.     Honeywell has ruthlessly and unlawfully acted to crush Aerotec and competitive threats to its monopoly in the relevant market for APU repairs. The purpose and effect of Honeywell's conduct is to restrict the ability of rival repair providers such as Aerotec to compete, cause customers to purchase repair services from Honeywell that they would have purchased elsewhere, severely injure and eliminate equally or more efficient rival repair providers and thereby artificially support, maintain and increase the price that Honeywell or its favored affiliates can extract from customers. The means by which Honeywell has pursued these unlawful ends are, in part, set forth below.

### As Aerotec Establishes Itself as an Increasingly Capable Competitor in the APU Repair Market, Honeywell Aggressively Reacts to Destroy Competition

39.     Following its formation in the early 1990s, Aerotec developed and expanded its operations, facilities and APU repair services customer base. As Aerotec did so, its ability to compete with more prominent repair providers, including Honeywell and its favored affiliates, steadily improved. Over the years, Aerotec experienced, with several notable exceptions, a generally typical customer-supplier relationship with Honeywell for the purchase and supply of the Honeywell APU replacement parts necessary for Aerotec to compete in the APU repair market. By 2006, Aerotec had developed the infrastructure, personnel, technical expertise and

facilities to significantly increase its position as a provider of efficient, cost-effective repair services. With continuing access to replacement parts at fair prices and on fair delivery terms, Aerotec was eager to compete on the merits and was poised to legitimately capture an even greater share of the repair market. Honeywell, however, had other plans.

40.     Several events occurred in late 2006/early 2007 which educated Honeywell that Aerotec had developed a growing customer base, was profitable yet charging low prices, and was acquiring APU repair business formerly provided by Honeywell. The first known event involved the erosion of Honeywell's APU repair relationship with Saudi Arabian Airlines ("Saudia"). At the time, Saudia had a large fleet of approximately 50 Boeing 777 and McDonnell Douglas MD-90 commercial aircraft installed with Honeywell APUs.

41.     For several years, Saudia had been under contract with Honeywell for APU repair services on these planes. Saudia was dissatisfied with Honeywell's performance and began evaluating the transition of its repair work to other repair facilities, including possibly Aerotec. In mid-2006, Saudia competitively bid its APU repair work. Saudia further sent several APUs to Aerotec for repair on a test basis to evaluate Aerotec's performance. Honeywell and Aerotec each responded to Saudia's request for bids. Saudia ultimately awarded a long-term APU maintenance agreement to Aerotec – not the incumbent Honeywell. The agreement was entered in March 2007 and effective beginning in June 2007. Given the size of the Saudia fleet, Aerotec reasonably expected to earn approximately $20 million in annual revenue from the Saudia agreement.

42.     At the same time these events with Saudia were occurring, Aerotec was exploring improvements in its business relationship and parts ordering procedures with Honeywell. Due

20

to steady increases in its APU repair business and its expanding customer base (e.g., Saudia), Aerotec anticipated corresponding increases in its purchases of APU replacement parts from Honeywell.  At that time and for several years preceding, Honeywell required Aerotec to pay full "cash in advance" on all purchases.  Aerotec sought to improve the order and fulfillment process with Honeywell by either becoming a Honeywell-affiliated repair provider or, at least, establishing credit terms consistent with Aerotec's payment record, credit risk and norms in the aviation industry.  As a predicate to "considering" Aerotec's requests for an enhanced relationship, Honeywell required Aerotec to disclose detailed financial information, which Aerotec did on multiple occasions from late 2006 through 2007.

43.     Honeywell rejected Aerotec's request to become an ASC, a Storefront or similar favored Honeywell affiliate, and refused to extend Aerotec a meaningful or workable credit line. In the process of reviewing Aerotec's submission, however, Honeywell gained access to confidential Aerotec data concerning its financial performance, cost structure, impressive margins, purchase volumes and suppliers.

44.     Moreover, by this time, Honeywell knew that Aerotec had acquired the substantial Saudia APU repair work previously performed by Honeywell and was fully aware (from review of Aerotec's proprietary financial information) that Aerotec was emerging as an energetic, nimble competitor capable of further eroding – on the merits – Honeywell's share of the APU repair market.  In a calculated response, Honeywell – the APU replacement parts monopolist – unleashed a campaign of oppressive and unlawful actions against Aerotec, each increasingly severe, designed either to eliminate Aerotec altogether or to so cripple Aerotec's operations that Aerotec could not compete in the APU repair market.

*Honeywell Subjects Aerotec to Discriminatory Pricing for APU Replacement Parts.*

45.    As replacement parts are often required to return an APU to service, the ability to purchase the full array of replacement parts for Honeywell APUs at competitive prices is essential for an APU repair provider to compete.  In the market for APU replacement parts, prices are generally expressed in relation to the manufacturer's (here, Honeywell's) published list prices charged to airlines/operators.  These published list prices are known as "airline catalog list prices."  Until late 2006, Honeywell generally charged Aerotec, and to Aerotec's knowledge other APU repair providers, prices less than or equal to airline catalog list prices for APU replacement parts.  Beginning in late 2007, without prior notice or explanation, Honeywell substantially increased the prices charged to Aerotec.  By January 2008, Honeywell was charging Aerotec 15% more than airline catalog list price for virtually all APU replacement parts.

46.    While Honeywell continues to charge Aerotec, and to Aerotec's knowledge other independent repair providers, 15% more than airline catalog list price for APU replacement parts, Honeywell charges other purchasers, including airlines and Honeywell-affiliated repair service providers, significantly less for identical parts.  Moreover, as further evidence of Honeywell's anticompetitive animus toward Aerotec, Honeywell has rejected airline customers' requests to purchase replacement parts from Honeywell at the lower prices quoted to the airline and have the parts "drop shipped" directly to Aerotec – a customary practice in the aviation industry.  The airlines made these requests because they desired Aerotec to perform the APU repairs.  Further, on occasions when Honeywell has refused or effectively refused to supply replacement parts to Aerotec, Aerotec has been able to purchase identical Honeywell parts at less than airline catalog list price from other APU repair providers who had purchased the parts

from Honeywell, thereby indicating that Honeywell sold the parts to competing repair providers at prices substantially less than the prices Honeywell charges Aerotec.

47.     Replacement parts often comprise the most expensive items in the repair of an APU.   As a result of Honeywell's discriminatory pricing scheme, Aerotec's costs for replacement parts are substantially higher than those of its competitors in the APU repair market, which severely impairs Aerotec's ability to compete.   Aerotec must either charge its customers higher prices to cover the higher prices that Honeywell charges Aerotec, thereby making Aerotec's services less attractive and causing lost sales, or absorb these costs and earn lower (or no) profits, which renders Aerotec less competitive than rivals who are not discriminated against.   Aerotec has lost existing and prospective customers because of the inflated prices Honeywell imposes on Aerotec.   Further, as Aerotec is unable to compete for many prospective APU repair jobs because of the discriminatory prices Honeywell charges Aerotec for replacement parts, customers are deprived of the superior service, expertise and workmanship Aerotec would otherwise provide.   This result harms the marketplace.

48.     There is no legitimate explanation for Honeywell's discriminatory pricing directed at Aerotec.   It is designed to, and does, divert customers of Aerotec to Honeywell or one of Honeywell's affiliated repair providers and unfairly restricts competition in the market.

*Honeywell's Calculated Strategy to Deny Aerotec Reasonable Access to APU Replacement Parts*

49.     In addition to imposing discriminatory pricing, since early 2007, Honeywell has subjected Aerotec to a litany of interrelated policies, practices and maneuvers that unlawfully deny Aerotec's access to necessary replacement parts and prevent Aerotec from competing in the APU repair market.   Honeywell fully appreciates and intends the impact of its actions.   As

*Cohen Kennedy Dowd & Quigley*

the dominant firm in many segments of the aviation industry, Honeywell knows that timely access to necessary replacement parts is essential to meeting customers' reasonable repair expectations and, thus, to competing in the marketplace. Yet, despite repeated pleas and demands from Aerotec that Honeywell desist and despite the negative short-term financial impact on Honeywell, it has continued to deprive Aerotec of access to essential replacement parts on reasonable terms.

50. Honeywell's disruption of Aerotec's access to necessary replacement parts begins with the unreasonable and unnecessarily burdensome ordering process to which Honeywell subjects Aerotec. Before 2007, Honeywell would inform Aerotec of the availability of replacement parts from Honeywell's inventory before Aerotec placed and paid for an order. Since early 2007, however, Honeywell has repeatedly represented that it has inventory available, upon which Aerotec reasonably relies to place orders and deal with its own customers. Then, after Aerotec places and fully prepays for an order, Honeywell frequently tells Aerotec that the previously "available" parts are now out of stock, unavailable to Aerotec because the parts are on a Honeywell-dictated "critical allocation," or subject to unreasonably and unjustifiably long delivery times. Aerotec routinely receives delivery, if at all, long after initial delivery schedules and well beyond the turnaround time reasonably expected by Aerotec's airline customers, who depend upon timely APU repairs to keep their aircraft operational. Aerotec is informed that Honeywell provides different (accurate) parts availability to other APU repair providers than Honeywell provides to Aerotec before the other repair providers place their orders. Honeywell fully appreciates and intends that its delayed deliveries of replacement parts cripple Aerotec's ability to compete for business in the repair market and deprive customers of Aerotec's cost-

effective repair services.  Honeywell's interminable delays, coupled with its requirement of full pre-payment by Aerotec, further ties up substantial Aerotec working capital for indefinite periods and deprives Aerotec of the ability to use the funds to expand or improve its business. At the same time, Honeywell receives the equivalent of an interest-free loan and has no motivation (because it already has Aerotec's funds) to fill the order of its formidable competitor, Aerotec.

51.    As part of its plan to eliminate Aerotec as a legitimate competitor, Honeywell engages in equally oppressive variations of this practice.  For example, after Honeywell represents to Aerotec that certain parts are "in stock" and Aerotec submits and fully prepays for the order, Honeywell often notifies Aerotec that the replacement parts are (supposedly) suddenly not available to Aerotec based on an undisclosed (and zealously guarded) Honeywell "allocation" policy or a Honeywell assertion that the parts are suddenly on "back order."  In other instances, Honeywell refuses to provide any inventory or delivery information to Aerotec prior to Aerotec placing and paying for an order.  At the same time, however, Honeywell regularly fulfills the purchase orders of its affiliated repair providers.  Honeywell's repeated de-prioritization of Aerotec's (fully pre-paid) orders and its arbitrary relegation of Aerotec to the bottom of Honeywell's allocation structure unreasonably and unfairly delays delivery of replacement parts that Aerotec needs to complete repairs on customers' APUs.  The result is that a customer (i.e., the owner/operator of an aircraft with a Honeywell APU) desiring to obtain Aerotec's repair services will pay more and be subjected to an unreasonably long turnaround time – not because Aerotec is less efficient than its competitors, but rather because of Honeywell's price discrimination and intentionally delayed deliveries to Aerotec.  There is no

valid business or pro-competitive justification for Honeywell's de-prioritization of Aerotec, delayed deliveries and refusal to provide accurate inventory and delivery information to Aerotec. Customers do not benefit and competition is impaired.

52.     As another part of Honeywell's strategy to harm Aerotec, with rare exceptions, Honeywell subjects Aerotec to an unreasonably arduous and inefficient ordering process that takes numerous days to fulfill and requires multiple levels of manual intervention by Aerotec personnel to place the order, fully prepay for the order, confirm the payment, and have the order ostensibly released into Honeywell's fulfillment cycle. Forcing Aerotec to submit to this labor-intensive process, to which Honeywell-affiliated and airline APU repair service providers are not subjected, significantly raises Aerotec's costs, diverts Aerotec personnel, delays deliveries, interferes with operations and reduces Aerotec's efficiency and competitiveness.

53.     After an Aerotec order is "placed," Honeywell repeatedly ignores or unreasonably delays responding to Aerotec's order status inquiries or provides false information about inventory availability and delivery time. Honeywell's oppressive and illogical ordering procedures for Aerotec are anomalous in the APU industry and much more onerous than the procedures imposed by other suppliers, including United Technologies.

54.     Another abusive tactic Honeywell employs to make it unreasonably difficult for Aerotec to obtain APU replacement parts in a manner that permits Aerotec to fulfill customer expectations for APU repairs is Honeywell's use of fictitious "credit holds" to suspend delivery of Aerotec's orders. Except for orders placed during a period when Honeywell extended a minimal credit line, Honeywell requires Aerotec to fully prepay all purchase orders. Honeywell will not release Aerotec's orders for processing until Honeywell's treasury department confirms

Aerotec's full prepayment – a wastefully laborious process that itself consumes multiple days. At that point in the purchasing process, and despite Honeywell already having Aerotec's funds, Honeywell routinely suspends processing Aerotec's orders on the false ground that Aerotec is on "credit hold." Aerotec learns about the "credit hold" when Honeywell fails to deliver the replacement parts and Aerotec is forced to contact Honeywell to determine order status. Aerotec then informs Honeywell what it already knows – the "credit holds" are improper because Aerotec has prepaid the full amount of the orders. Honeywell's scheme to disrupt Aerotec's operations through repeated, false "credit holds" severely delays replacement part deliveries and impairs Aerotec's ability to meet customer commitments and, thus, to effectively compete in the APU repair market.

55.    If Aerotec is able to overcome the unnecessarily onerous Honeywell ordering process, Honeywell routinely fails to deliver the APU replacement parts within a reasonable time and refuses to provide accurate information about when parts deliveries will occur. Honeywell's inordinate delay in shipping replacement parts to Aerotec effectively denies Aerotec access to necessary parts and far exceeds industry norms for a complete APU overhaul, let alone delivery of replacement parts. Honeywell does not subject airlines and Honeywell-affiliated repair providers to the same protracted, unreasonable lead times. Honeywell's targeted action to cripple Aerotec is further evidenced by the fact that Aerotec has been able to procure Honeywell replacement parts from other repair providers, which, in turn, obtained the parts from Honeywell through orders placed <u>after</u> Aerotec submitted and fully paid for its original order with Honeywell. Moreover, Honeywell cannot credibly blame its failure to deliver parts to Aerotec on purported industry shortages. On multiple occasions, after

Honeywell represents to Aerotec that fully prepaid parts could not be delivered because they are on "critical allocation," Aerotec has contacted other repair providers, which then place and receive timely delivery of orders for the same parts from Honeywell, all the while Honeywell continues to represent to Aerotec the parts are not available.  Honeywell's misconduct often forces Aerotec to "double buy" many parts (i.e., prepayment to Honeywell for parts that are interminably delayed, followed by a second purchase of the same parts from other repair service providers who buy and timely receive the parts from Honeywell) and consumes millions of dollars of Aerotec working capital that otherwise could be deployed to improve Aerotec's operations and efficiency and enhance competition in the marketplace.

56.     When Honeywell ships replacement parts to Aerotec, it often only partially fills an order and withholds a subset of the parts required for Aerotec to complete an APU repair. Or, Honeywell releases later-placed, lower-priority parts for shipment while withholding high-priority parts Aerotec needs to complete a repair for an airline customer with whom Honeywell desires to do business.  Honeywell knows that its failure to deliver all parts necessary (and ordered by Aerotec) to complete a repair is the equivalent of refusing to deliver any parts and prevents Aerotec from completing the affected APU repair work.  Honeywell's actions frustrate APU customer expectations, damage Aerotec's reputation and impair customer operations as the affected APU remains out of service until Honeywell finally delivers the full complement of replacement parts.

57.     Honeywell further interferes with Aerotec's ability to compete by overtly favoring Honeywell-affiliated APU repair providers, which pay Honeywell less and on credit terms, in the allocation of APU replacement parts.  Honeywell benefits through royalties and

restrictions on the proliferation of PMA parts and DER repairs when APU repair business goes to Honeywell-affiliated repair service providers instead of to independent providers such as Aerotec.  As noted above, Honeywell routinely delivers replacement parts to affiliated APU repair providers before filling Aerotec's prior and prepaid orders.   Similarly, Honeywell misrepresents replacement parts availability to Aerotec and diverts parts ordered by Aerotec to Honeywell-affiliated repair providers so that the Honeywell affiliates may obtain repair business that otherwise would go to Aerotec.  For example, in late 2007, while under contract with Aerotec, Saudia desired to send multiple Honeywell model 331 APUs to Aerotec for service.  At that time, however, Honeywell's refusal to timely supply replacement parts to Aerotec had caused Aerotec to not meet the repair turn time specified in its contract with Saudia.  Because Honeywell would, and did, provide the necessary replacement parts to European Pneumatic Component Overhaul & Repair BV ("EPCOR"), a Honeywell-affiliated APU repair provider located in Europe, Saudia did not use Aerotec and instead diverted the high-dollar, model 331 work to EPCOR.  Since that time, Saudia has engaged EPCOR to perform APU repairs on multiple additional model 331 APUs and Aerotec has lost tens of millions of dollars of service work it would have procured but for Honeywell's wrongful favoritism of its affiliate.  Honeywell's actions cause Aerotec customers to send their APU services work to Honeywell's own repair division or to Honeywell affiliates, who enjoy access to the replacement parts that Honeywell effectively denies to Aerotec.

58.     Yet another element of Honeywell's strategy to harm Aerotec and destroy its ability to fairly compete is Honeywell's failure, in violation of its stated policies and longstanding industry standards, to escalate Aerotec orders for replacement parts necessary to

prevent a customer's aircraft from being grounded, known in the aviation industry as Aircraft on Ground ("AOG").   AOG is an extremely serious and negative occurrence.   Grounding a commercial aircraft can cause an airline huge financial losses and logistical difficulties.   An aircraft on AOG status may not return to service until the repair issues are remedied.   Because of the emergency situation created when an aircraft is or will imminently be AOG, Honeywell (as other OEMs) claims its allocation policy reserves the highest priority for replacement parts, including parts in limited supply, to promptly remedy AOG situations.   Contrary to its stated practices, however, Honeywell has refused to properly escalate and expedite Aerotec's orders of APU replacement parts needed to cure or prevent imminent AOG status for Aerotec customers, including its largest customer, Saudia.   As a result, Saudia diverted APU repair work from Aerotec to a Honeywell-favored repair provider to whom Honeywell would supply the necessary parts.

59.     Honeywell's actions summarized above combine to effectively deny Aerotec reasonable access to the APU replacement parts that are essential for Aerotec to compete with other APU repair providers, including Honeywell and its favored affiliates, in the APU repair market.   These actions disrupt Aerotec's operations, impair Aerotec's ability to obtain, plan, schedule and perform APU repairs, prevent Aerotec from fulfilling customer commitments in a commercially reasonable manner, deprive customers of the Aerotec repair services they otherwise desire, and cause customers to divert their business from Aerotec to Honeywell or one of its favored affiliates.   Moreover, these practices are not the result of innocent mismanagement or ineptitude by Honeywell – the multi-billion dollar world leader in the aviation industry.   Rather, they are key components of Honeywell's strategy to exploit its

30

control over the replacement parts market for Honeywell APUs and interfere with, and ultimately eradicate, Aerotec's otherwise proven ability to effectively compete in the APU repair market and strengthen Honeywell's own market share.

**Honeywell Intensifies Its Efforts to Destroy Aerotec's Ability to Compete**

*Restricting Access to Essential Technical Information and Tooling*

60.    Beyond its discriminatory pricing and refusal to supply necessary replacement parts, Honeywell further impairs Aerotec's ability to compete by restricting Aerotec's access to essential technical information and tooling.  FAA regulations require repair providers to service APUs in accordance with the methods, techniques and practices prescribed in the OEM's current maintenance manuals or Instructions for Continued Airworthiness ("ICA").  Similarly, federal regulations mandate use of the tooling, equipment and test facilities necessary to ensure completion of the repair work consistent with accepted industry practices.  As an FAA-certified APU repair station, Aerotec is required to maintain the current OEM inspection and repair information (e.g., ICA, maintenance and overhaul manuals, service bulletins, etc.) necessary to ensure regulatory compliance and proper repair of APUs.  Federal regulations require OEMs to make such ICA available to any person required to comply with the ICA.

61.    Honeywell interferes with Aerotec's ability to compete in the APU repair market by improperly restricting its access to essential, federally-mandated technical inspection and repair information and by refusing to make available the specialized tooling/equipment Honeywell (as OEM) mandates for use in servicing certain Honeywell APUs.  Honeywell has systematically removed substantial ICA, inspection, repair, dimensional and tooling information from its manuals and refuses to sell or make available to Aerotec current manuals for certain

Honeywell APUs. Similarly, Honeywell refuses to allow Aerotec to purchase specialized tooling and equipment specified by Honeywell for certain APU repairs. Honeywell has stated that it will not permit Aerotec to purchase the required tooling or equipment as Aerotec is not an airline owner/operator or a Honeywell-"authorized" repair provider. Of course, Aerotec is fully authorized by the FAA to perform the repairs for which Aerotec requires the information, tooling or equipment. Moreover, as an FAA certified repair station, Aerotec is entitled to the data necessary to determine if an APU is serviceable and airworthy.

62.     Aerotec is FAA-authorized and has demonstrated that it possesses the personnel, equipment and expertise to provide superior repair services for Honeywell APUs. Honeywell's refusal to provide the required ICA repair, inspection and other technical information, and tooling creates completely artificial obstacles to competition, restricts the number of repair providers that can compete for work on Honeywell APUs, and threatens both the integrity of APU repairs and, ultimately, passenger safety. Moreover, Honeywell's refusals increase the costs to Aerotec to perform APU repair work. Without necessary Honeywell inspection and repair information or tooling, Aerotec must either develop DER repair processes to substitute for the repair information formerly in Honeywell's repair manuals or, in many instances, purchase new Honeywell APU replacement parts rather than simply repairing existing parts (which Aerotec can often accomplish on an equally efficacious but more cost-efficient basis). Further, replacement parts cannot even be installed without appropriate inspection and repair data. Honeywell's refusal to provide this data needlessly increases the cost of the overall APU repairs for the customer and financially benefits Honeywell. Additionally, forcing the purchase of new parts to replace otherwise repairable parts impairs the competitive service advantages

Aerotec offers to customers and lacks any legitimate pro-competitive justification.  Finally, Honeywell's actions impair Aerotec's ability to expand its repair operations into new Honeywell APU product lines as Aerotec cannot acquire the technical repair information and specialized tooling to perform the APU repairs consistent with the performance, safety and tooling standards specified by Honeywell.  Both Aerotec and the marketplace are injured by Honeywell foreclosing Aerotec's entry and expansion into the market for certain APU repair services.

63.    Honeywell's calculated removal of inspection, repair and ICA data from its manuals has forced Aerotec to develop multiple DER processes to repair Honeywell APUs. Many of the DERs developed by Aerotec are based on repairs Honeywell once included in, but has since arbitrarily removed from, its manuals.  Honeywell has leveraged its removal of repair data and the resulting forced development of DERs by independent APU repair providers to artificially eliminate competition in the APU repair market.  Honeywell manipulates APU customers into obtaining repair services only from providers that do not use DERs.  This "steering" favors Honeywell by rendering many providers ineligible to perform the repair services and substantially forecloses the market without pro-competitive justification.

*Honeywell Pretextually Demands Confidential Aerotec Customer Information*

64.    By 2008, Honeywell's predatory actions were achieving their intended results and had substantially impaired Aerotec's ability to compete with Honeywell and its favored affiliates.  Nevertheless, Honeywell intensified its attack.  Improperly leveraging its control over access to necessary APU replacement parts, in early 2008, Honeywell began requiring Aerotec to disclose confidential customer information (which Honeywell labels "end-user data") as an absolute condition to accepting an Aerotec purchase order.  Honeywell requires Aerotec to

identify the customer and specific details relating to the use of the ordered replacement parts before Honeywell will process or fill Aerotec's orders. Honeywell did not previously require this information. Honeywell falsely claims that the information is required by U.S. Export Administration Regulations. However, the federal export regulations do not apply to purchases by Aerotec, which is located in the United States (in the same city as Honeywell). Moreover, the information Honeywell now demands, after years of not requiring it, is extremely confidential and proprietary as Aerotec may be ordering replacement parts to perform repairs on a test basis for a potential new customer – information Aerotec would never disclose to a competitor, such as Honeywell, absent Honeywell's ability to force disclosure of the data through its monopoly control over the supply of APU replacement parts.

*Honeywell Exploits the Impact of Its Failure to Supply Replacement Parts by Disparaging Aerotec*

65.    In addition to the actions described above, Honeywell has seized upon the very injuries it has inflicted to disparage Aerotec in the marketplace. Aerotec has learned that Honeywell has repeatedly sought to harm Aerotec's business by informing airline customers or prospective customers that they should not engage Aerotec because Aerotec is unable to obtain Honeywell APU replacement parts, does not have appropriate Honeywell technical inspection and repair information, and cannot timely complete APU repairs. Honeywell has repeatedly denigrated Aerotec to customers as a "mom and pop shop" with inadequate repair capability and stated that it is risky to retain Aerotec because it will not remain in business. Honeywell, which controls the replacement parts supply chain for its APUs, has intentionally and improperly placed Aerotec at an unfair, anticompetitive disadvantage. Honeywell's actions to use its monopoly power to create Aerotec's supply problems, and then point to these

34

Honeywell-created obstacles as a reason not to do business with Aerotec, is wrongful and compelling evidence of Honeywell's anticompetitive objectives.

**Honeywell Uses Illegal Bundled Pricing to Further Subvert
Competition for APU Repair Services**

66.     In addition to the Honeywell misconduct described above, Honeywell has used its control over APU replacement parts to unlawfully acquire significant APU repair work from customers by offering substantially lower bundled pricing on the combined price for APU replacement parts and repair services if the customers purchase the entire bundle and retain Honeywell as their exclusive provider of APU parts and repair services.  Conversely, Honeywell imposes a pricing penalty on customers who do not purchase the entire parts/repairs bundle from Honeywell.  Honeywell uses this bundled pricing strategy to exclude competitors, such as Aerotec, who are equally or more efficient repair service providers but cannot offer replacement parts at the low bundled prices offered by Honeywell.

67.     In soliciting airline customer work using this scheme, Honeywell identifies separate prices for repair services and APU replacement parts but then applies a substantial reduction to the bundle of services and parts to arrive at a total bundled price.  The resulting price is available only if the customer purchases the entire bundle.  Honeywell will not separately sell replacement parts or repairs at their bundled prices.  Honeywell is able to offer bundled prices only because of its control over the manufacture and sale of Honeywell APU replacement parts.  Through its bundled pricing, Honeywell is effectively offering APU repairs at prices below the appropriate measure of Honeywell's cost of providing the repairs and

excluding equally or more efficient repair providers who do not manufacture APU replacement parts.

68.    In addition to Honeywell's unlawful bundled-pricing penalties (i.e., Honeywell charges substantially higher prices if the customer does not buy the bundle), Honeywell also induces customers with multi-million dollar credits, forgiveness of past debts and non-traditional, extremely elongated payment terms if the customers will agree to purchase APU replacement parts and repairs from Honeywell.  These calculated strategies have the effect of even further lowering the anticompetitive price at which Honeywell sells APU repair services, cause customers to deal exclusively with the dominant market player, Honeywell, and foreclose market competition.

69.    Honeywell has employed this unlawful bundled pricing strategy to procure contracts from multiple airline customers, including many of Aerotec's core, long-term customers, such as Avianca, Aeroméxico, OceanAir and European Air Transport.  These airline customers have transferred some or all of their APU repair work from Aerotec to Honeywell because of the extraordinary low bundled pricing, not because Honeywell is a more efficient or able provider of APU repairs.  The loss of these customers has been devastating to Aerotec. Honeywell's bundled pricing scheme is unlawful, exclusionary, anticompetitive and effectively requires customers to purchase Honeywell's APU repair services as a condition to being able to purchase APU replacement parts.

### The Impact of Honeywell's Anticompetitive Conduct

70.    Honeywell's intentional, anticompetitive and unlawful actions have devastated Aerotec.  Aerotec has the facilities, technical expertise and personnel to provide superior and

36

less costly APU repair services.  But for Honeywell's oppressive conduct, Aerotec would excel as a competitor in this market.  However, Honeywell's price discrimination, illicit bundled pricing practices, exclusive dealing agreements, refusal to provide Aerotec reasonable access to essential APU replacement parts, technical repair information and specialized tooling, and other bad acts described above have had their intended effect: Aerotec has lost many actual and prospective customers and suffered increased operational costs, decreased profits and diminished economies of scale.  Aerotec's ability to compete with Honeywell or its favored affiliates in the APU repair market has been deeply damaged and Aerotec's continued existence jeopardized.   To the great detriment of Aerotec, competition and airline customers, Honeywell's actions have eliminated customers' choices of desired, superior APU repair options and stifled development of replacement part alternatives such as PMAs in the marketplace.  The results of Honeywell's misconduct do not enhance competition, but instead inflict the anticompetitive injuries the antitrust laws are intended to prevent.

71.     Despite Aerotec's diligent efforts to mitigate the impact of Honeywell's anticompetitive conduct, Honeywell has irreparably harmed Aerotec's business and reputation. Honeywell has caused customers to take tens of millions of dollars of APU repair work away from Aerotec and direct the work to Honeywell or its favored affiliates.  Honeywell's refusal to fairly supply APU replacement parts further prevents Aerotec from acquiring new APU repair work.  Honeywell's actions have impugned Aerotec's well-earned reputation as a provider of high quality, timely, and cost-effective APU repairs.  If not enjoined, Honeywell's actions may force Aerotec out of business and unlawfully eliminate competition in the APU repair market.

### FIRST CLAIM FOR RELIEF
**(Illegal Tying in Violation of 15 U.S.C. § 1)**

72.     Aerotec incorporates the allegations contained in Paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.     Honeywell has market power in the relevant market for Honeywell APU replacement parts.

74.     Honeywell has unreasonably restrained trade and commerce and abused its power in the market for Honeywell APU replacement parts by tying sales of replacement parts to the sale of Honeywell's APU repair services.  As detailed above, replacement parts for Honeywell APUs and APU repair services are separate and distinct products/services and are in separate and distinct markets.   Honeywell unlawfully ties them together by entering agreements with customers whereby Honeywell sells the tying product, i.e., APU replacement parts, over which Honeywell has appreciable market power, only if the customers also purchase Honeywell repair services or agree not to obtain those services from another repair provider. Further, by effectively refusing to supply replacement parts to independent repair providers (who do not need or purchase Honeywell's repair services), Honeywell is unlawfully tying the sale of APU replacement parts to the sale of Honeywell's own repair services.  APU owners who do not self-service their own APUs and would prefer to purchase APU repairs from a Honeywell rival cannot purchase replacement parts from Honeywell unless they also purchase Honeywell's APU repair services.

75.     Honeywell further ties sales of replacement parts to the sale of Honeywell repair services through the unlawful bundled pricing practices, credits, debt forgiveness, payment

38

terms and other inducements described above.  By entering agreements whereby customers receive substantially lower prices and other financial incentives on the sale of APU replacement parts and repair services, but <u>only</u> if the customers agree to purchase the entire bundle, Honeywell effectively imposes pricing penalties on customers who do not purchase the items as a bundle and causes customers to purchase the tied item – APU repairs – that they would otherwise purchase from Honeywell's competitors.  Honeywell's bundled pricing policy, which Honeywell can impose only because of its market power over necessary APU replacement parts, leaves customers with no rational economic choice but to purchase the entire bundle – including APU repairs – from Honeywell.

76.    Honeywell exploits its market power over the tying product, APU replacement parts, to cause APU customers to purchase repair services that they otherwise would purchase from Honeywell's competitors, such as Aerotec.  As a result, Honeywell unreasonably restrains competition on the merits in the tied market, APU repairs, and exacts an unfair advantage by extending Honeywell's market power over APU replacement parts to the APU repair market.

77.    Honeywell's unreasonable restraint of trade, through the unlawful tying of Honeywell APU replacement parts to the sale of Honeywell repair services, affects interstate commerce and a nontrivial amount of tied sales as millions of dollars of APU repairs are performed each year.

78.    Honeywell's actions are not justified by valid business reasons or lawful, pro-competitive efficiencies.

79.    As a direct and proximate result of Honeywell's unlawful tying agreements, Aerotec has suffered substantial injury to its business and property in an amount to be proven

at trial.  Aerotec is entitled to treble its actual damages pursuant to 15 U.S.C. § 15.  Honeywell's unlawful tying agreements have also injured customers and the marketplace by artificially restricting the available choices of qualified APU repair providers, limiting access to efficient, high-quality APU repairs, causing customers to make purchases from Honeywell they would otherwise make from Honeywell rivals and denying customers the benefits of free competition in the APU repair services market.

## SECOND CLAIM FOR RELIEF
### (Unlawful Restraint of Trade Through Exclusive Dealing and Bundled Pricing Conditioned on Exclusivity in Violation of 15 U.S.C. § 1)

80.     Aerotec incorporates the allegations contained in Paragraphs 1 through 79 of this Complaint as though fully set forth herein.

81.     In addition to the unlawful tie described in the First Claim for Relief, Honeywell has further unreasonably restrained trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, through its use of exclusive dealing agreements with APU repair customers to foreclose a substantial portion of the APU repair market from rival repair providers.  Honeywell enters long-term (sometimes 10 years or more), exclusive APU repair agreements with owners of new aircraft containing Honeywell APUs at the time the owners purchase or take delivery of the aircraft.  Further, by imposing a severe pricing penalty if customers do not commit to purchasing APU repairs only from Honeywell, Honeywell employs the bundled pricing and related financial inducement strategies described above to cause customers to deal exclusively with Honeywell to obtain APU repairs.  While Honeywell's agreements take several forms, they result in customers purchasing APU repair services exclusively from Honeywell for the multi-year duration of each agreement, thereby removing a

substantial portion of the APU repair market from Honeywell competitors, including Aerotec, and substantially lessening competition in that market.  Through its use of these exclusive APU repair agreements, Honeywell restrains competition by impairing rival efficiency, worsening market options available to customers, and reducing or eliminating constraints on Honeywell's market power.

82.    Honeywell's unreasonable restraint of trade through exclusive dealing and the resulting substantial foreclosure of the market for APU repairs affects interstate commerce and a nontrivial amount of sales as millions of dollars of APU repairs are performed each year.

83.    Honeywell's actions are not justified by valid business reasons or lawful, pro-competitive efficiencies.

84.    As a direct and proximate result of Honeywell's unlawful restraint of trade, Aerotec has suffered substantial injury to its business and property in an amount to be proven at trial.  Aerotec is entitled to treble its actual damages pursuant to 15 U.S.C. § 15.  Honeywell's unlawful actions have also injured customers and the marketplace by artificially restricting the available choices of qualified APU repair providers, limiting access to efficient, high-quality APU repairs, causing customers to make purchases from Honeywell they would otherwise make from Honeywell rivals and denying customers the benefits of free competition in the APU repair market.

**THIRD CLAIM FOR RELIEF**
**(Monopolization in Violation of 15 U.S.C. § 2)**

85.    Aerotec incorporates the allegations contained in Paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86.     Honeywell possesses monopoly power in the relevant market for APU repairs.

87.     Honeywell willfully acquired or maintained monopoly power in the relevant APU repair market, not by virtue of providing superior service, business acumen or historic accident, but rather through willful, anticompetitive and exclusionary conduct.

88.     As described above, Honeywell materially and negatively altered the terms of its previous voluntary supply relationship with Aerotec and made it unreasonably difficult, and on numerous occasions impossible, for Aerotec to obtain the replacement parts needed to compete in the APU repair market.  Beginning in 2007, Honeywell refused to deal with Aerotec by, inter alia, significantly delaying the delivery of necessary APU replacement parts, refusing to provide accurate information concerning parts deliveries, charging Aerotec prices materially above both airline catalog list and what Honeywell charges non-rivals for replacement parts, denying Aerotec access to APU technical inspection, repair and ICA information and specialized tooling, and subjecting Aerotec to the unreasonably grievous ordering and delivery tactics described above.

89.     Through these actions, Honeywell discriminates against a rival and in favor of non-rivals.  Honeywell refuses to deal with rivals, such as Aerotec, on the same terms as it deals with non-rivals, such as airlines that self-service their APUs, airlines that purchase repair services from Honeywell and Honeywell-affiliated repair providers.   Honeywell's prior voluntary supply relationship with Aerotec followed by its unilateral refusal to deal reveals that Honeywell's conduct is motivated by an intention to injure a competitor and harm competition. Honeywell's actions constitute an unlawful refusal to deal with Aerotec in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

90.     In addition, Honeywell engages in willful, anticompetitive and exclusionary conduct by refusing to provide Aerotec reasonable access to facilities that are essential for Aerotec to compete with Honeywell and others in the APU repair market.  Honeywell controls facilities, such as Honeywell APU replacement parts, APU technical inspection, repair and ICA information and specialized tooling, that are essential for Aerotec to meaningfully compete in the APU repair market.  Aerotec is unable to reasonably or practically duplicate or access these facilities due to significant barriers to market entry.  Honeywell unjustifiably denies Aerotec reasonable access to these facilities, while discriminatorily providing access to non-rivals of Honeywell, including airlines and Honeywell-affiliated APU repair providers.   As its past conduct establishes, Honeywell is able to reasonably and feasibly provide these essential facilities to Aerotec.  Honeywell is obligated to do so under Section 2 of the Sherman Act, 15 U.S.C. § 2.

91.     Honeywell engages in further willful, anticompetitive and exclusionary conduct through pricing policies that impose substantial penalties (in the form of differential pricing and related foregone inducements, such as credits, debt forgiveness and elongated payment terms) on APU repair customers who do not purchase from Honeywell the full bundle of APU replacement parts and APU repair services.  The substantially lower prices offered by Honeywell on replacement parts and repair services are not available unless the APU customer purchases the entire bundle.  Allocating the bundled price differentials and related inducements to the separate prices of Honeywell's APU repair services, Honeywell effectively sells its APU repair services at prices below an appropriate measure of Honeywell's costs of providing the services.

92.     Honeywell's bundled pricing practices are anticompetitive and unlawful as they exclude equally or more efficient competitors in the APU repair market simply because those providers do not sell as many products or services as Honeywell.  Moreover, Honeywell would earn greater profits by selling to APU repair providers, such as Aerotec, the APU replacement parts that are contained in the bundles than Honeywell earns by selling the bundled replacement parts and repair services to end-user customers.  Honeywell elects to forego these short-run benefits in order to reduce competition in the APU repair market over the long run by damaging or eliminating its competitors.

93.     Honeywell also engages in willful, anticompetitive and exclusionary conduct to acquire and maintain monopoly power in the APU repair market by entering long-term, exclusive dealing repair agreements with APU customers, which foreclose competition and prevent rivals from threatening Honeywell's dominant market share.

94.     Honeywell's anticompetitive conduct is not justified by valid business reasons or lawful, pro-competitive efficiencies.

95.     Through Honeywell's willful refusals to deal, refusals to provide access to essential facilities, bundled pricing practices and exclusive dealing arrangements, Honeywell has unlawfully acquired or maintained monopoly power in the APU repair market.  Honeywell's exclusionary actions impair the ability of rival APU repair providers, such as Aerotec, to compete by raising their costs, reducing their efficiency and market share and reducing competitive constraints on Honeywell's monopoly power and pricing.

96.     As a direct and proximate result of Honeywell's anticompetitive, exclusionary actions, Aerotec has suffered substantial injury to its business and property in an amount to be

44

proven at trial.  Aerotec is entitled to treble its actual damages pursuant to 15 U.S.C. § 15.

Honeywell's conduct has also injured customers and the marketplace by artificially restricting

the available choices of qualified APU repair providers, limiting access to efficient, high-quality

APU repairs, and eliminating both competition and constraints on Honeywell's dominant

market power in the APU repair market.

### FOURTH CLAIM FOR RELIEF
**(Attempted Monopolization in Violation of 15 U.S.C. § 2)**

97.     Aerotec incorporates the allegations contained in Paragraphs 1 through 96 of this

Complaint as though fully set forth herein.

98.     Honeywell willfully attempts to monopolize the APU repair services market, not

by virtue of providing superior service, business acumen or historic accident, but rather through

the anticompetitive and exclusionary conduct set forth above.   This conduct includes

Honeywell terminating its previous, voluntary supply relationship with Aerotec and instead

refusing to deal with Aerotec or to provide reasonable access to Honeywell APU replacement

parts, APU technical inspection, repair and ICA information and specialized tooling.  As these

items are also facilities to which access is essential for Aerotec to meaningfully compete in the

APU repair market, but which Aerotec is unable to reasonably or practically duplicate,

Honeywell's refusal to provide Aerotec reasonable access to these facilities is anticompetitive

and exclusionary.  Honeywell is able to reasonably and feasibly provide these essential facilities

to Aerotec.

99.     Honeywell further attempts to monopolize the APU repair market, not by virtue

of providing superior service, but through its anticompetitive and exclusionary practice of

imposing substantial pricing penalties (in the form of differential pricing and related foregone inducements such as substantial credits, debt forgiveness and elongated payment terms) on APU repair customers who do not purchase from Honeywell the full bundle of APU replacement parts and repair services.  As detailed above, the substantially lower prices offered by Honeywell on replacement parts and repair services are not available unless the customer purchases the entire bundle.  Allocating the bundled price differentials and related inducements to the separate prices of Honeywell's repair services, Honeywell effectively sells its repair services at prices below an appropriate measure of Honeywell's cost of providing the services.

100.   Honeywell's bundled pricing practices are anticompetitive and unlawful as they exclude equally or more efficient competitors in the APU repair market simply because those providers do not sell as many products or services as Honeywell.  Moreover, Honeywell would earn greater profits by selling to APU repair providers, such as Aerotec, the APU replacement parts that are contained in the bundles than Honeywell earns by selling the bundled replacement parts and repair services to end-user customers.  Honeywell elects to forego these short-run benefits in order to reduce competition in the APU repair market over the long run by damaging or eliminating its competitors.

101.   Honeywell further attempts to monopolize the APU repair market, not by virtue of providing superior service, but through its anticompetitive and exclusionary practice of entering long-term, exclusive dealing repair agreements with APU customers to foreclose competition and prevent rivals from posing a threat to Honeywell capturing a dominant market share.

Cohen Kennedy Dowd & Quigley

102.    Honeywell engages in this anticompetitive and exclusionary conduct with the specific intent to control prices, destroy competition, obtain an unfair competitive advantage and monopolize the APU repair market.

103.    Through Honeywell's anticompetitive and exclusionary conduct, there is a dangerous probability that Honeywell will achieve monopoly power in the APU repair market.

104.    Honeywell's anticompetitive conduct is not justified by valid business reasons or lawful, pro-competitive efficiencies.

105.    As a direct and proximate result of Honeywell's attempt to monopolize the APU repair market through its willful refusals to deal, refusals to provide access to essential facilities, bundled pricing practices and exclusive dealing arrangements, Aerotec has suffered substantial injury to its business and property in an amount to be proven at trial.  Aerotec is entitled to treble its actual damages pursuant to 15 U.S.C. § 15.  Honeywell's attempted monopolization has also injured customers and the marketplace by artificially restricting the available choices of qualified APU repair providers, limiting access to efficient, high-quality APU repairs, and eliminating both competition and constraints on Honeywell's dominant market power in the APU repair market.

**FIFTH CLAIM FOR RELIEF**
**(Price Discrimination in Violation of 15 U.S.C. § 13)**

106.    Aerotec incorporates the allegations contained in Paragraphs 1 through 105 of this Complaint as though fully set forth herein.

47

107.    Honeywell sells APU replacement parts in interstate commerce to, among others, Aerotec, other APU repair providers, including Honeywell's favored affiliated repair providers, and airlines that compete to provide APU repair services.

108.    The APU replacement parts Honeywell sells to Aerotec and to those with whom Aerotec competes to provide APU repairs are of like grade and quality.

109.    Honeywell purposefully discriminates against Aerotec by charging it significantly higher prices for Honeywell APU replacement parts than Honeywell charges other purchasers with whom Aerotec competes to provide APU repair services.

110.    The difference between the prices that Honeywell charges Aerotec for Honeywell APU replacement parts and what Honeywell charges other APU repair providers is substantial and has the anticompetitive effects of substantially reducing competition and injuring Aerotec's ability to compete with Honeywell and other repair providers that pay lower prices than Aerotec for identical replacement parts purchased from Honeywell.

111.    Honeywell's price discrimination toward Aerotec is not justified by valid business reasons or lawful, pro-competitive efficiencies.

112.    As a direct and proximate result of Honeywell's unlawful price discrimination, Aerotec is forced to pay substantially more than its competitors for APU replacement parts and its ability to compete in the APU repair market is impaired, thereby causing substantial injury to its business and property in an amount to be proven at trial.  Aerotec is entitled to treble its actual damages pursuant to 15 U.S.C. § 15.

## SIXTH CLAIM FOR RELIEF
### (Violation of Arizona Antitrust Laws, Ariz. Rev. Stat. § 44-1401 *et. seq.*)

113.   Aerotec incorporates the allegations contained in Paragraphs 1 through 112 of this Complaint as though fully set forth herein.

114.   By the acts described above in Aerotec's claims for relief under federal antitrust law, Honeywell has (i) entered agreements in restraint of, or to monopolize, trade and commerce within Arizona in violation of Ariz. Rev. Stat. § 44-1402, and (ii) established, maintained or used a monopoly, or attempted to establish a monopoly, of trade and commerce within Arizona for the purpose excluding competition or maintaining prices in violation of Ariz. Rev. Stat. § 44-1403.

115.   Honeywell's conduct is anticompetitive and unlawful pursuant to Ariz. Rev. Stat. § 44-1401 *et seq*.

116.   Honeywell's anticompetitive conduct is not justified by valid business reasons or lawful, pro-competitive efficiencies.

117.   As a direct and proximate result of Honeywell's anticompetitive conduct within Arizona, Aerotec has suffered substantial injury to its business and property in an amount to be proven at trial.  Honeywell's anticompetitive conduct has also injured customers and the marketplace by artificially restricting the available choices of qualified APU repair providers, limiting access to efficient, high-quality APU repair services, and eliminating both competition and constraints on Honeywell's dominant market power in the APU repair market.  Moreover, Honeywell's violations of Arizona's antitrust laws are flagrant and Aerotec is entitled to an award of treble actual damages pursuant to Ariz. Rev. Stat. § 44-1408(B).

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations)

118.    Aerotec incorporates the allegations contained in Paragraphs 1 through 117 of this Complaint as though fully set forth herein.

119.    In the course of conducting its business, Aerotec has entered contractual relationships to provide APU repairs for customers, including, among others, Saudia, Avianca, Aeroméxico, OceanAir, European Air Transport and other commercial airlines and aircraft operators.

120.    Honeywell is aware of Aerotec's contractual relationships with these and other customers.  As the dominant APU OEM and replacement parts supplier, Honeywell monitors the status of its APUs and knows who provides repair services.  Further, Honeywell requires Aerotec to disclose confidential customer information before Honeywell will accept Aerotec purchase orders and, thus, knows the identity of the customers for whom Aerotec performs APU repairs.

121.    Through the oppressive, unlawful and anticompetitive conduct described above, Honeywell has intentionally interfered with, and often destroyed, Aerotec's ability to fulfill its contractual obligations to customers and illegally induced or caused Aerotec customers to terminate or severely reduce APU repair contracts with Aerotec.  Honeywell's improper and intentional acts of interference include: refusals to provide Aerotec with fair access to the Honeywell APU replacement parts, technical inspection, repair and ICA information and specialized tooling essential for Aerotec to compete in the APU repair market; refusing to provide accurate information concerning parts availability or deliveries; unlawfully tying the

availability of APU replacement parts to the purchase of Honeywell's repair services; employing unlawful bundled pricing practices and similar inducements relating to the combined sale of Honeywell APU replacement parts and repair services; discriminating against Aerotec with respect to the price of Honeywell APU replacement parts; exploiting the harms Honeywell has inflicted by using them as a basis to disparage and malign Aerotec's abilities as an APU repair provider; and otherwise abusing its economic and market power over Aerotec.

122.   Honeywell's interference is improper.   As a direct competitor of Aerotec, Honeywell engages in this heavy-handed misconduct to severely injure and attempt to destroy an otherwise formidable competitor, cause Aerotec customers to terminate their relationships with Aerotec and divert their APU repair business to Honeywell or favored Honeywell affiliates, eliminate or restrict competition and customer choice in the APU repair market, and lessen or remove constraints on Honeywell's future actions or pricing in that market.

123.   As a direct and proximate result of Honeywell's improper interference with Aerotec's contractual relationships, Aerotec has lost customers and business and suffered substantial damages in an amount to be proven at trial.   Moreover, Honeywell's actions are intentional, aggravated and committed with an evil mind and an intent to cause injury, or in reckless and/or deliberate disregard of an unjustifiably substantial risk of significant harm to Aerotec.   Aerotec is entitled to an award of punitive damages against Honeywell in an amount sufficient to punish Honeywell and to deter Honeywell and others similarly situated from engaging in like conduct in the future.

**EIGHTH CLAIM FOR RELIEF**
**(Tortious Interference with Prospective Business Advantage)**

124.   Aerotec incorporates the allegations contained in Paragraphs 1 through 123 of this Complaint as though fully set forth herein.

125.   As the dominant supplier of APU replacement parts and a competitor of Aerotec in the APU repair market, Honeywell is aware of Aerotec's relationships with airlines and other prospective customers and of Aerotec's interest in, and efforts to obtain, additional APU repair business.  Honeywell is also patently aware of the critical importance of price, timely access to APU replacement parts and technical repair information, and repair turnaround time to an APU repair provider's ability to compete for business.  Aerotec has a valid business expectancy of renewing and expanding its relationships with existing customers and of entering new relationships with prospective customers.

126.   Through its oppressive, unlawful and anticompetitive conduct described above, Honeywell intentionally interfered with Aerotec's efforts to acquire additional APU repair business and expanded customer relationships, and caused prospective customers to not engage Aerotec.  Honeywell's improper and intentional acts of interference include: refusals to provide Aerotec with fair access to the Honeywell APU replacement parts, technical inspection, repair and ICA information and specialized tooling essential for Aerotec to compete in the APU repair market; refusing to provide accurate information concerning parts availability or deliveries; unlawfully tying the availability of APU replacement parts to the purchase of Honeywell's APU repair services; employing unlawful bundled pricing practices and similar inducements relating to the combined sale of Honeywell APU replacement parts and repair

services; discriminating against Aerotec with respect to the price of Honeywell APU replacement parts; exploiting the harms Honeywell has inflicted by using them as a basis to disparage and malign Aerotec's abilities as an APU repair provider to Aerotec's prospective customers; and otherwise abusing its economic and market power over Aerotec.

127.    Honeywell's interference is improper.   As a direct competitor of Aerotec, Honeywell engages in this heavy-handed conduct to severely injure and attempt to destroy an otherwise formidable competitor and interfere with Aerotec's ability to acquire additional or expanded customer relationships for APU repair work, cause potential Aerotec customers to instead engage Honeywell or its favored affiliates, restrict and eliminate customer choice and competition in the APU repair market, and lessen or remove constraints on Honeywell's future actions or pricing in that market.

128.    As a direct and proximate result of Honeywell's improper interference with Aerotec's prospective business advantage, Aerotec has lost prospective business relationships and suffered substantial damages in an amount to be proven at trial.   Moreover, Honeywell's actions are intentional, aggravated and committed with an evil mind and an intent to cause injury, or in reckless and/or deliberate disregard of an unjustifiably substantial risk of significant harm to Aerotec.   Aerotec is entitled to an award of punitive damages against Honeywell in an amount sufficient to punish Honeywell and to deter Honeywell and others similarly situated from engaging in like conduct in the future.

## NINTH CLAIM FOR RELIEF
### (Injurious Falsehood)

129.   Aerotec incorporates the allegations contained in Paragraphs 1 through 128 of this Complaint as though fully set forth herein.

130.   Honeywell has published false and derogatory statements concerning Aerotec's APU repair capabilities and its business in general.  Honeywell has disparaged Aerotec by informing current and potential Aerotec customers that Aerotec is going out of business, that Aerotec does not have adequate APU repair facilities, technical repair information, tooling or access to APU replacement parts, that Aerotec cannot perform appropriate APU repairs and that a customer's APU performance will be jeopardized if the customer procures repair services from Aerotec.

131.   Honeywell has willfully and wantonly made these and related derogatory statements about Aerotec with knowledge of, or in reckless disregard of, their falsity.

132.   Honeywell has made these false statements to damage the business and reputation of Aerotec, to prevent existing and prospective customers from doing business with Aerotec, and to unfairly and illegitimately advance the interests of Honeywell or its favored affiliated APU repair providers by obtaining business from existing and prospective customers of Aerotec.

133.   As a result of the injurious falsehoods published by Honeywell, Aerotec has lost existing and prospective APU repair business and suffered damage to its reputation within the aviation industry.

134.   As a direct and proximate result of Honeywell's injurious falsehoods, Aerotec has suffered substantial damages in an amount to be proven at trial.  Moreover, Honeywell's actions are intentional, aggravated and committed with an evil mind and an intent to cause injury, or in reckless and/or deliberate disregard of an unjustifiably substantial risk of significant harm to Aerotec.  Aerotec is entitled to an award of punitive damages against Honeywell in an amount sufficient to punish Honeywell and to deter Honeywell and others similarly situated from engaging in like conduct in the future.

## TENTH CLAIM FOR RELIEF
### (Deceptive Trade Practices in Violation of Ariz. Rev. Stat. § 44-1521 *et. seq.*)

135.   Aerotec incorporates the allegations contained in Paragraphs 1 through 134 of this Complaint as though fully set forth herein.

136.   Ariz. Rev. Stat. § 44-1521, *et. seq.*, makes illegal any "act, use or employment" of "deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived or damaged thereby."

137.   As described above, Honeywell has engaged in deceptive trade practices in connection with the advertisement and sale of Honeywell APU replacement parts to Aerotec. Honeywell's deceptive practices include, but are not limited to, repeated material misrepresentations to Aerotec that certain APU replacement parts sought by Aerotec were "in stock" or otherwise available for reasonable delivery to Aerotec.  In reliance on Honeywell's false representations, Aerotec has ordered and paid for the subject parts.  After receipt of

55

*Cohen Kennedy Dowd & Quigley*

Aerotec's orders and payment, Honeywell has failed to deliver parts as represented or disclosed for the first time that the parts are not available to Aerotec.

138.   Honeywell intends for Aerotec to rely upon Honeywell's representations and material concealments by continuing to place orders and make advance payment for Honeywell APU replacement parts.   Honeywell thereby obtains the use of Aerotec's funds and deprives Aerotec of both vital working capital and the replacement parts Aerotec needs to perform APU repairs and compete in that market.   Aerotec relied on Honeywell's material misrepresentations in ordering and fully prepaying for APU replacement parts.

139.   Honeywell's misrepresentations were made in connection with the advertisement and sale of Honeywell APU replacement parts, which constitute "merchandise" under Ariz. Rev. Stat. § 44-1521(5).

140.   Honeywell's use of deception in connection with the sale of APU replacement parts is an unlawful practice pursuant to Ariz. Rev. Stat. § 44-1522.

141.   As a direct and proximate result of Honeywell's deceptive trade practices, Aerotec has suffered substantial damages in an amount to be proven at trial.   Moreover, Honeywell's actions are intentional, aggravated and committed with an evil mind and an intent to cause injury, or in reckless and/or deliberate disregard of an unjustifiably substantial risk of significant harm to Aerotec.   Aerotec is entitled to an award of punitive damages against Honeywell in an amount sufficient to punish Honeywell and to deter Honeywell and others similarly situated from engaging in like conduct in the future.

56

**REQUESTED RELIEF**

Aerotec requests judgment against Honeywell as follows:

A.    For the Court to declare that Honeywell has violated the Sherman Act, 15 U.S.C. §§ 1, 2, the Robinson-Patman Act, 15 U.S.C. § 13, the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401 *et. seq.*, Ariz. Rev. Stat. § 44-1521 *et. seq.*, and Aerotec's common law rights as set forth in this Complaint;

B.    For compensatory damages in an amount to be proven at trial resulting from Honeywell's federal and state antitrust violations as set forth in this Complaint, trebled pursuant to 15 U.S.C. § 15 and Ariz. Rev. Stat. § 44-1408;

C.    For compensatory damages in an amount to be proven at trial resulting from Honeywell's violations of Ariz. Rev. Stat. § 44-1521 *et. seq.* and Aerotec's common law rights as set forth in this Complaint;

D.    For punitive damages in an amount sufficient to punish Honeywell and deter it and others similarly situated from engaging in like conduct in the future;

E.    For injunctive relief, pursuant to 15 U.S.C. § 26 and Ariz. Rev. Stat. § 44-1408, to enjoin Honeywell from engaging in further conduct to unlawfully restrain trade, discriminate in pricing, withhold essential facilities, monopolize, attempt to monopolize or otherwise impair competition in the APU repair market in violation of federal and Arizona antitrust laws;

F.    For Aerotec's attorneys' fees and costs pursuant to 15 U.S.C. §§ 15(a), 26 and Ariz. Rev. Stat. § 44-1408(B);

G.    For pre- and post-judgment interest on all sums awarded at the highest rate allowed by law until paid in full; and

H.    For such other relief as the Court deems appropriate.

DATED:  February 26, 2010.

**COHEN KENNEDY DOWD & QUIGLEY, P.C.**
The Camelback Esplanade I
2425 East Camelback Road, Suite 1100
Phoenix, Arizona  85016
  Attorneys for Aerotec International, Inc.


By:    /s/ Daniel G. Dowd
        Ronald Jay Cohen
        Daniel G. Dowd
        Daniel P. Quigley
        Gabriel R. Aragon
        Betsy J. Lamm