1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF ARIZONA

10

11  Aerotec International, Inc.,           )

12            Plaintiff,                   )    2:10-cv-00433 JWS

13      vs.                                )    AMENDED* ORDER AND OPINION

14  Honeywell International, Inc.,         )    [Re: Motions at Dockets 107 & 115]

15            Defendant.                   )

16

17                    **I.  MOTIONS PRESENTED**

18        At docket 107, Plaintiff Aerotec International, Inc. ("Aerotec") filed a motion for

19  summary judgment on all of its claims against Defendant Honeywell International, Inc.

20  ("Honeywell").  Aerotec's supporting statement of facts is at docket 108.  Honeywell

21  filed its response at docket 122, along with its controverting statement of facts filed at

22  docket 123.  Aerotec's reply is at docket 130, and additional facts in support of the reply

23  are at dockets 131 and 132.

24        At docket 115, Honeywell filed a motion for summary judgment on all claims.  Its

25  supporting statement of facts is at docket 116.  Aerotec's response is at docket 137,

26  and its controverting statement of facts is at docket 138.  Honeywell's reply is at

27  docket 142.  All documents related to the summary judgment motions were filed under

28  seal.  Oral argument was heard on December 5, 2013.

1

## II.  BACKGROUND

2      The case at hand relates to competition in the repair market for auxiliary power

3 units ("APUs").  APUs are small engines in commercial aircraft that provide power

4 needed for non-propulsion functions such as electric power for on-board electrical

5 equipment and for air conditioning the cabin.  Honeywell and Hamilton Sundstrand are

6 the two major manufacturers of APUs, but Honeywell is the largest manufacturer of

7 APUs for commercial aircraft.  Honeywell manufactures and sells approximately a

8 dozen different models of APUs.

9      APUs need routine maintenance, as well as repair and overhaul ("MRO")

10 services.  When an airline does not perform its own MRO services, it typically will solicit

11 bids from MRO service providers for long-term contracts.  An airline usually has more

12 than one type of aircraft, and therefore has to arrange MRO services for different

13 models of APUs.  Consequently, an airline will often contract for MRO services with

14 more than one provider.

15      The most common MRO service agreements are Maintenance Service

16 Agreements ("MSAs") and Not-To-Exceed Agreements ("NTEs").  Both types generally

17 have terms of three to seven years.  Under a standard MSA, an MRO service provider

18 charges an airline a negotiated rate based on number of hours spent on repairs, and in

19 exchange the airline agrees to send all APUs of the model covered under the MSA to

20 the MRO service provider for repairs and overhaul for the duration of the agreement.

21 An NTE agreement is a commitment to repair a certain APU model for a price that will

22 not exceed a negotiated amount.  That is, an airline will agree to a set rate for labor and

23 parts, but the total charge for any given APU repair job cannot exceed the amount

24 negotiated by the parties.

25      Honeywell provides MRO services for Honeywell APU models.  Indeed, it is the

26 largest provider of MRO services for Honeywell APUs.  Honeywell uses NTE

27 agreements most often.  There are at least 49 other MRO service providers around the

28

1 world that service Honeywell APUs.  These include independent MRO service providers

2 and airlines that service their own APUs and the APUs of other airlines.

3      APU component parts are often needed to complete an APU repair, and thus

4 MRO service providers need to obtain component parts.  Parts that come from the

5 original APU manufacturer are known as "OEM parts."  Honeywell sells Honeywell-

6 branded OEM parts for its APUs.  Other MRO service providers, airlines, brokers, and

7 distributors purchase these parts to use or sell for Honeywell APU repairs.  Thus, the

8 independent MRO service providers that compete with Honeywell for repair contracts

9 are also Honeywell's customers in the component parts market.

10      Some MRO service providers have contractual arrangements with Honeywell for

11 technical support and/or component parts.  In addition to straightforward supply

12 agreements for component parts, these agreements take the form of storefront

13 agreements and authorized service center ("ASC") agreements.  If an MRO service

14 provider has a storefront agreement with Honeywell, Honeywell will consign certain

15 OEM parts at the provider's store for the provider's use, but Honeywell owns the

16 inventory until the MRO service provider needs the inventory for an APU repair job.

17 Honeywell is cutting back on storefront agreements.  More common is an ASC

18 agreement.  An MRO service provider with an ASC agreement with Honeywell means

19 that the provider is an authorized service center for selected models of Honeywell

20 APUs.  The ASC agreements are negotiated between the parties and can vary, but

21 generally, as part of these ASC agreements, the MRO service provider receives some

22 benefits for entering into such an agreement: discounts for the purchase of certain OEM

23 parts, priority of OEM parts allocation, and a license to use Honeywell's intellectual

24 property regarding the repair of APUs.  In return, the ASC agreements typically impose

25 certain obligations on the MRO service provider, such as requiring the provider to pay

26 royalty fees to Honeywell, to use only Honeywell OEM parts for repairs of the APU

27 models covered by the agreement, to maintain minimum inventory levels of OEM parts,

28 and to use certain quality control measures.

1    MRO service providers that do no have agreements with Honeywell can buy

2  OEM parts directly from Honeywell or from brokers, distributors, and others who have

3  surplus parts to sell.  They can also buy aftermarket substitute parts, which are APU

4  parts that have been reverse engineered to replicate Honeywell-branded OEM parts.

5  The suppliers go through a process known as "parts manufacturing authority" to obtain

6  approval of these substitute parts; these parts are commonly referred to as "PMA"

7  parts.  PMA parts are less expensive than OEM parts but are less common and more

8  difficult to obtain for certain Honeywell APU models.  Typically, however, the

9  aftermarket will have more PMA parts as well as more surplus OEM parts available for

10  a certain APU model as that model ages and is installed in aircraft more frequently.

11    In order to compete with Honeywell, which is both the supplier of component

12  parts and a large competitor for MRO service contracts, MRO providers promote their

13  quick turn around time for repairs and availability of spare APUs for the customer's use

14  as benefits of their services over Honeywell's services.  Additionally, the independent

15  MRO service providers that are not contractually obligated to use Honeywell parts can

16  use PMA parts as a way to reduce costs; although, as discussed above, PMA parts are

17  not always readily available.

18    Aerotec is an independent MRO service provider for several APU models,

19  including both Honeywell APUs and Hamilton Sundstrand APUs.  Aerotec competes

20  with Honeywell in the MRO service market.  Aerotec controls a small share of the

21  market, with less than 1.0% of the Honeywell APUs in existence under contract for

22  repair services.  Aerotec is also a customer of Honeywell in the component parts

23  market, buying Honeywell-branded OEM parts that it uses to perform MRO services on

24  Honeywell APUs.  It does not have a contractual agreement with Honeywell and thus

25  buys parts on a purchase order to purchase order basis.  The record reflects that in

26  addition to Aerotec there are at least four other completely independent MRO service

27  providers; that is, service providers who do not have any storefront or ACS agreements

28  with Honeywell.

Aerotec filed a complaint against Honeywell, arguing that Honeywell has used its position as the predominant APU manufacturer and component parts supplier to behave in an anticompetitive manner in the MRO service market in violation of antitrust laws and price discrimination laws.  Aerotec's first claim alleges that Honeywell engaged in illegal tying in violation of Section 1 of the Sherman Act by using its power in the market for Honeywell APU component parts to tie sales of such parts to the sale of Honeywell's MRO services.  Aerotec's second claim alleges Honeywell engaged in exclusive dealing and bundled pricing in violation of Section 1 of the Sherman Act by using "exclusive dealing agreements with APU repair customers to foreclose a substantial portion of the APU repair market from rival repair providers" and imposing "a severe pricing penalty if customers do not commit to using Honeywell repair services." Aerotec's third claim and forth claim for relief allege that Honeywell engaged in monopolization and attempted monopolization, respectively, in violation of Section 2 of the Sherman Act by effectively refusing to deal with Aerotec, failing to provide Aerotec reasonable access to facilities that are essential for it to compete in the repair market, using bundled pricing, and requiring exclusive dealing arrangements with repair customers.  The fifth claim for relief alleges that Honeywell engaged in price discrimination in violation of the Robinson-Patman Act.  Aerotec's sixth claim for relief alleges Honeywell violated Arizona's antitrust laws, and its seventh through tenth claims for relief allege that Honeywell committed various business torts in violation of Arizona law.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

_____

[1]Fed. R. Civ. P. 56(a).

judgment."[2]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3]  However, summary judgment is mandated under Rule 56(c) "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[4]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[5]  The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[6]  Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[7]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[8]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[9]

---

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[5]*Id.* at 323.

[6]*Id.* at 323-25.

[7]*Anderson,* 477 U.S. at 248-49.

[8]*Id.* at 255.

[9]*Id.* at 248-49.

1

## IV.  DISCUSSION

2

### A. Section 1 of the Sherman Act

3    Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of

4   trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

5   States, or with foreign nations, is declared to be illegal."[10]  The Supreme Court has

6   interpreted Section 1 narrowly, proscribing "only unreasonable restraints."[11]  Thus, to

7   establish a Section 1 claim, Aerotec must show: "'1) that there was a contract,

8   combination, or conspiracy; 2) that the agreement unreasonably restrained trade under

9   either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint

10   affected interstate commerce.'"[12]

11    Here, Aerotec asserts that Honeywell enters into agreements with customers in

12   the APU repair market that unreasonably restrain trade.  First, it argues that Honeywell

13   forecloses competition in the APU repair sector by tying Honeywell-branded APU parts

14   to Honeywell's MRO services in a manner that is per se illegal.  Second, it argues that

15   Honeywell forecloses competition by using exclusive dealing agreements with APU

16   repair customers. The court will address each claim in turn.

17   **1. Tying**

18    Aerotec asserts that Honeywell engages in illegal tying.  "A tying arrangement

19   exists when a seller conditions the sale of one product or service (the tying product or

20   service) on the buyer's purchase of another product or service (the tied product or

21   service)."[13]  Not all tying arrangements are illegal.  As the Supreme Court has held:

22    [T]he essential characteristic of an invalid tying arrangement lies in the seller's
23    exploitation of its control over the tying product to force the buyer into the

24   ---

   [10]15 U.S.C. §1.

25

   [11]*State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

26

27    [12]*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th 2001) (quoting
   *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991)).

28

   [13]*Id.* at 1157.

purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.[14]

Courts "generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the 'rule of reason,'" which seeks to distinguish between restraints with anticompetitive effects and those with stimulating effects on competition based on the actual market conditions.[15]  However, certain tying arrangements can be per se violations.  When a seller has sufficient market power in the tying product or service so that the existence of coercion is probable and there is a substantial potential for impact on competition, a tying arrangement can be proscribed without looking at the actual market conditions.   For a tying claim to be considered a per se violation, "a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market."[16]

Aerotec asserts that Honeywell's practices amount to per se illegal tying, claiming that Honeywell uses its dominant position in the market for Honeywell APU parts to coerce APU owners, who need Honeywell APU component parts for APU repairs, to purchase MRO services from Honeywell.  To show that parts and repair services are two distinct products or services that Honeywell has tied together, Aerotec relies on *Eastman Kodak Co. v. Image Technical Services.*[17]  In *Eastman Kodak*, the plaintiffs were independent repair providers for Kodak photocopier machines.  The plaintiffs alleged that Kodak, the manufacturer and parts supplier for Kodak machines

[14]*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

[15]*Brantley*, 675 F.3d at 1197.

[16]*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).

[17]504 U.S. 451 (1992).

-8-

and also a repair provider for its own machines, only sold replacement parts to machine owners who agreed not to buy repair services from the plaintiffs— the independent repair providers.  In other words, Kodak refused to sell the needed Kodak machine parts to plaintiffs and to machine owners who wanted to buy component parts and have an independent repair provider conduct the repairs.  The Supreme Court held that in these circumstances, parts and repair were two distinct products and that there was sufficient evidence of a tie between them.[18]  The basis for the Court's conclusion that there was a tie between parts and service was not simply that Kodak refused to sell parts to independent repair providers, but rather that Kodak only sold parts to third parties on the condition that they buy repair service from Kodak or repair the machines themselves.[19]  There was evidence that certain customers wanted to buy only parts from Kodak and not a bundled parts/service package, but that there was no option to do so.[20]  Those were the customers foreclosed by the tie.

Aerotec's reliance on *Eastman Kodak* is misplaced.  Aerotec alleges that it seeks to sell the same parts/repair service to APU owners that Honeywell provides, but that it is foreclosed from doing so because Honeywell limits it access to component parts needed to complete repairs.  Aerotec does not allege that customers are foreclosed from buying its MRO services because Honeywell conditions sale of its parts on an agreement not to buy MRO services from an independent provider.  Aerotec does not allege that it attempts to provide unbundled MRO service to customers who obtain their own Honeywell parts but cannot do so because Honeywell will not sell parts to anyone

---

[18]*Id.* at 463.

[19]*Id.* at 463 n.8; *see also* 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1748 at 253 (3d ed. 2011).

[20]*Eastman Kodak*, 504 U.S. at 458, 463.

1  unless they also use Honeywell MRO services.[21]  It is undisputed Honeywell sells parts

2  to airlines and other Honeywell customers without conditioning those sales on the

3  purchase of Honeywell's MRO services.  There is also evidence that Honeywell sells

4  parts to other MRO service providers, including Aerotec.[22]  Thus, *Eastman Kodak* does

5  not govern the outcome here.

6      Aerotec also argues that Honeywell's bundling of parts and repairs at a discount

7  is effectively a tie between parts and repairs, because it induces customers to buy

8  repair services from Honeywell as opposed to buying repair services from other MRO

9  providers.  Yet, there is no evidence that customers are *foreclosed* from using Aerotec

10  by a tie.  Even if the APU parts and repair services are tied, Aerotec has not presented

11  evidence that would prove the second element needed to prove an illegal tie.

12  "Essential to the second element of a tying claim is proof that the seller *coerced* a buyer

13  to purchase the tied product."[23]  There is no evidence from which the court can

14  presume coercion.  In *Cascade Health*, the Ninth Circuit noted that a small proportion of

15  separate sales can show that a bundled discount is as effective as a refusal to sell the

16  tying product separately.[24]  Based on the facts of *Cascade Health*, where only 14% of

17  customers made separate purchases, the Ninth Circuit concluded that the low

18

19  [21] This distinction is discussed in 10 Areeda & Hovenkamp, *supra* note 19, at ¶1748 at

20  253:

> Rather than merely seeking to sell the same bundle to machine
21  owners, the plaintiffs sought to sell unbundled service to customers
> of Kodak parts.  Only those customers are foreclosed by a tie.
22  Customers desiring only the parts/service bundle buy a single
> finished product, for they are not foreclosed to the plaintiffs by a tie
23  but only by Kodak's refusal to sell parts to the plaintiffs.

24  [22]Doc. 116-3.  Aerotec does not dispute this fact but argues that the delivery of such

25  parts are untimely.  This issue will be addressed in relation to Aerotec's Section 2 claims, but it

26  is not relevant to the tying claim.  The relevant issue is whether any customers are foreclosed

   from Aerotec because of a tie.

27  [23]*Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

28  [24]515 F.3d at 914.

percentage of separate sales indicated some degree of coercion sufficient for the issue to go to the jury.[25]  Here, using Aerotec's figures, at least 46% of APU repairs involve the purchase of parts separate from Honeywell's MRO services.[26]  That relatively high percentage of separate sales prevents the court from presuming coercion based on the bundled discount.[27]  Indeed, because there is a sufficiently large percentage of customers not using Honeywell for repair services, the court actually presumes that Honeywell has not engaged in tying.[28]  Aerotec correctly notes that the 46% figure improperly includes airlines who repair their own APUs and therefore do not purchase repair services.  However, Aerotec fails to provide any evidence to indicate what the correct percentage of separate purchasers should be after taking into account such airlines, and the undisputed evidence shows that Honeywell sells parts separate from repairs.  It may be added that some of the airlines perform MRO services for others.

Aerotec has failed to present any direct evidence of coercion.  There is no evidence that Honeywell only sells needed component parts to customers who also commit to using its MRO services or to those MRO service providers who are affiliated with Honeywell through an ASC or storefront agreement.[29]  There is no testimony from

---

[25]*Id.* at 915.

[26]Aerotec does not dispute this figure.  Doc. 116 at ¶ 9; Doc. 138 at ¶ 9.

[27]*See* 10 Areeda & Hovenkamp, *supra* note 19, ¶1758b at 363 (suggesting separate sales below 10% presumptively indicates a de facto tie).

[28]*Id.* ¶1758 at 358 (suggesting a "presumption of non-tying if *either* (1) the bundle passes the attribution test or (2) a sufficiently large number of customers are observed who purchase the secondary product from someone other than the defendant").  Aerotec argues that Honeywell's bundled discount does not pass the attribution test.  However, as explained in 10 Areeda & Hovenkamp, *supra* note 19,  ¶1758 at 358, the court will presume non-tying even if the bundle does not pass the attribution test as long as there is sufficient evidence of separate sales.  Moreover, Aerotec has not demonstrated that Honeywell's bundled pricing fails the attribution test, as discussed in detail below.

[29]*Paladin*, 328 F.3d at 1160 (noting evidence of coercion can consist of a written contract with a seller with market power that contained a provision requiring a buyer to purchase the tied product or deposition testimony by a buyer confirming that a defendant

1  customers that it was a matter of economic imperative to choose Honeywell as the

2  repair provider.[30]  While Aerotec presents evidence to show that Honeywell uses long-

3  term repair contracts, it provides no evidence to show that the duration or terms of

4  these contracts are either out of the ordinary for the MRO service market or onerous.[31]

5  **2. Exclusive Dealing**

6  Aerotec alleges that Honeywell's exclusive dealing arrangements with its MRO

7  service customers violate Section 1 of the Sherman Act.  "An exclusive dealing

8  arrangement is an agreement in which a buyer agrees to purchase certain goods or

9  services only from a particular seller for a certain period of time."[32]  Exclusive dealing

10  arrangements have recognized economic benefits and pro-competitive effects and

11  "generally pose little threat to competition."[33]  Consequently, exclusive dealing

12  arrangements are not per se violations of Section 1; they only violate Section 1 when

13  used by a dominant supplier of a product or service to unreasonably deprive other

14  suppliers of a market.[34]  Therefore, the "rule of reason" must be used to determine

15  whether the challenged exclusive dealing arrangements have anticompetitive effects.

16

17

18

19

20  refused to sell the needed tying product unless the buyer also bought the tied product).

21  [30]*Cascade Health*, 515 F.3d at 914-15 (finding evidence of coercion based in part on a
22  customer's testimony that she had been "held hostage" by defendant's pricing practices).

23  [31]*Paladin*, 328 F.3d at 1160 (noting that evidence of coercion has been found when a
    plaintiff produces a written contract that required the purchase of the tied product on "extremely
24  onerous terms").

25  [32]*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

26  [33]*Id.*; *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d
27  991, 996 (9th Cir. 2010).

28  [34]*ZF Meritor*, 696 F.3d at 270; *Allied Orthopedic*, 592 F.3d at 996.

1    The Ninth Circuit has adopted a burden-shifting approach to the rule of reason

2    analysis.[35]  "The plaintiff bears the initial burden of showing that the restraint produces

3    significant anticompetitive effects within the relevant product and geographic markets."[36]

4    As part of this burden, the plaintiff must show that the defendant has market power in

5    the defined market and that the challenged conduct restrains trade in that market.[37]  It is

6    essential for the plaintiff to demonstrate that the challenged conduct injures

7    competition.[38]

8    Aerotec has not met its initial burden to show that Honeywell's customer

9    agreements with exclusive dealing provisions have significant anticompetitive effects on

10    the repair market for Honeywell APUs.  Aerotec asserts that Honeywell's power in the

11    repair market alone is sufficient evidence for the court to find that its exclusive dealing

12    agreements probably exclude rivals.  But it is not enough that exclusive dealing

13    agreements have the probable effect of foreclosing competition.[39]  To show harm to

14    competition from an exclusive dealing arrangement, the plaintiff must show that the

15    arrangement *"actually foreclosed competition"* in a substantial share of the relevant

16    market.[40]

17    Aerotec presents evidence that it lost business to Honeywell and that its market

18    share declined from .71% to .55%.  Such evidence is insufficient; plaintiffs like Aerotec

19

20    [35]*See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996) (applying a

21    burden-shifting analysis to determine whether the restraint's harm to competition outweighs its

      procompetitive effects).

22

23    [36]*Id.*

24    [37]*See Bhan*, 929 F.2d at 1413.

25    [38]*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989);

26    *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) (stating that proof of

      impact on competition "is an absolutely essential element" in a rule of reason case).

27    [39]*Allied Orthopedic*, 592 F.3d at 996 n.1.

28    [40]*Id.* at 996, 996 n.1.

must "prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market."[41]  Assuming the relevant market is the Honeywell APU repair market, as opposed to the APU repair market as a whole, and that Honeywell controls about 50% of that market as Aerotec asserts, it has not produced any data to show how much of that repair market is foreclosed by Honeywell's customer agreements which contain exclusive dealing provisions.  Aerotec merely argues that "undoubtedly, the vast majority of [Honeywell's] 50% [market share] is locked in with long-term exclusive repair contracts."[42]  It does not provide any evidence to show how many customers are locked into long-term agreements.  This evidence is necessary because it is undisputed that Honeywell also has non-exclusive agreements with its repair customers.[43]  Moreover, there is nothing in the record to prove that Aerotec's decline in business after 2008 was also experienced by other MRO service providers during this time frame or that these declines constitute "substantial foreclosure."  While injury to a single competitor can constitute injury to competition when the relevant market is both narrow and discrete and the market participants are few,[44] here, the evidence shows that there are at least forty-nine MRO service providers.[45]  Any foreclosure of Aerotec, with its small market share, does not affect competition in the market in general.

---

[41]*Les Schockley*, 884 F.2d at 508.

[42]Doc. 137 at p. 21.

[43]Doc. 116 at ¶¶ 34-36; Doc. 138 at ¶¶ 34-36.

[44]*Les Shockley*, 884 F.2d at 508-09.

[45]*See* doc. 138 at ¶ 9 (challenging the inclusion of 16 of the 65 repair firms listed by Honeywell, leaving 49 unchallenged).

**B. Section 2 of the Sherman Act**

Section 2 of the Sherman Act makes it unlawful for a person to monopolize or attempt to monopolize "any part of the trade or commerce among the several States."[46] The possession of monopoly power alone is not an antitrust violation.  It must be accompanied by an element of anticompetitive conduct.[47]  Thus, the elements of a Section 2 monopolization claim include both "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[48]  The elements of a Section 2 attempted monopolization claim are similar but "differ[ ] primarily in the requisite intent and the necessary level of monopoly power."[49]  They include predatory or anticompetitive conduct on the part of the defendant with a "specific intent to monopolize" and "a dangerous probability of achieving monopoly power."[50]  In addition, private parties alleging such antitrust violations must demonstrate antitrust injury,[51] which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[52]  To prevail on either a monopolization claim or an attempted monopolization claim, a plaintiff must demonstrate that defendant engaged in anticompetitive conduct and that the harm suffered flowed from that conduct.  Thus,

---

[46]15 U.S.C. § 2.

[47]*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004).

[48]*Id.*

[49]*Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (*"Eastman Kodak II"*).

[50]*Cascade Health*, 515 F.3d at 893.

[51]*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

[52]*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

-15-

the court will first consider whether Aerotec has shown the requisite anticompetitive

conduct and injury.

### 1. Refusal to deal/ denial of essential facilities

Aerotec alleges that Honeywell violates Section 2 by refusing to deal with

Aerotec on reasonable terms and/or denying it access to essential APU component

parts.  It argues that Honeywell subjects it to an onerous ordering system, delays

shipments of needed component parts, refuses to provide accurate information about

delivery of parts, charges it higher prices for parts than it does non-rivals, refuses to

provide it with technical data, and implements restrictive payment terms.  In addition to

raising arguments as to why it has not engaged in unlawful conduct under the "refusal

to deal" theory of monopolization, Honeywell urges the court to consider the lack of

antitrust injury generally.

The purpose of antitrust law is to preserve competition for the benefit of

consumers.[53]  "Even an act of pure malice by one business competitor against another

does not, without more, state a claim under the federal antitrust laws."[54]  The purpose of

antitrust law is not to protect market participants from the market; it is to protect the

public from market failure.[55]  Whether or not the defendant's conduct is anticompetitive

requires the court to focus on whether the alleged unlawful conduct harms prices or

quality of the goods or services in the relevant market.[56]

Here, Aerotec asserts that it has suffered injuries as a result of Honeywell's

unreasonable business terms.  More specifically, Aerotec argues that it has put forth

---

[53]*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir. 1999).

[54]*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).

[55]*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993).

[56]*See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("[T]he antitrust laws are only concerned with acts that harm 'allocative efficiency *and* raise[ ] the price of goods above their competitive level or diminish[ ] their quality.'" (quoting *Rebel Oil*, 51 F.3d at 1433)).

enough evidence to show, or at least create a genuine issue of fact for trial, that it lost good will and suffered a reduced market share because of Honeywell's actions. But such evidence is not enough. Aerotec must show that these injuries, even assuming they are caused by Honeywell's conduct, are not just the product of vigorous competition. Aerotec must put forth evidence that Honeywell's conduct relating to the supply of parts and technical data, harms the competitive process by raising prices for MRO repair customers or diminishing the quality of MRO services market-wide.

Aerotec relies on the "refusal to deal" theory of monopolization set forth in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*[57] to argue that Honeywell's conduct was anticompetitive. Generally speaking, the Sherman Act does not restrict a business's right to choose the parties with whom it will deal.[58] *Aspen Skiing* presents a limited exception to that general proposition.[59] *Aspen Skiing* concerned the four mountains comprising the ski market in Aspen, Colorado. The defendant owned three of the mountains and the plaintiff owned the fourth. For years the parties sold a multi-day, area-wide lift ticket which allowed the purchasers to ski on any of the mountains. The defendant stopped offering the joint ticket and refused to deal with the plaintiff so that the plaintiff could provide customers a comprehensive lift ticket. The Supreme Court upheld the verdict in favor of the plaintiff, noting the long history of the voluntary business relationship, the abrupt termination of the arrangement, and the lack of any pro-competitive explanation for the change.[60]

Since *Aspen Skiing*, the Supreme Court has significantly restricted its reach. The Court has warned that *Aspen Skiing* "is at or near the outer boundary of § 2

---

[57]472 U.S. 585 (1985)

[58]*Trinko*, 540 U.S. at 408.

[59]*Id.*

[60]*Aspen Skiing*, 472 U.S. at 608, 610-11.

-17-

1   liability."[61] *Aspen Skiing* involved an outright refusal to deal.  Here, it is undisputed that

2   Honeywell does, in fact, sell parts to Aerotec.  Aerotec instead alleges that Honeywell's

3   business practices towards it are unfair and onerous, but "courts are loathe to interfere

4   when the claim is that the defendant is actually dealing, but only on disadvantageous or

5   onerous terms."[62]  Such interference requires the court to manage the parties' business

6   relations.  Indeed, Aerotec asks the court to enjoin Honeywell from engaging in this type

7   of conduct in the future.  That would require the court to identify proper prices,

8   quantities, allocations of APU parts, and determine what proprietary information

9   Honeywell should turn over to Aerotec, something which it is ill-suited to do as noted by

10  the Supreme Court.[63]

11      Although the rationale in *Aspen Skiing* reaches far enough to include situations

12  where the terms of dealing are unreasonable,[64] this is not a situation where the

13  unreasonable terms are so onerous that they act as an outright refusal.  While

14  Honeywell's conduct in relation to Aerotec may have been frustrating, damaging, and

15  even malicious, the evidence shows that Aerotec continued to do business and obtain

16  parts from Honeywell in addition to other sources; thus, there is no indirect refusal

17  situation present here.

18      Furthermore, there is no evidence that Honeywell's conduct caused harm to the

19  competitive process.  There is no evidence in the record to show that Aerotec's

20  problems with Honeywell in terms of acquiring component parts and technical data

21

22  ─────────────

23      [61]*Trinko*, 540 U.S. at 409.

24      [62]3B Areeda & Hovenkamp, *supra* note 19, ¶774e at 279.

25      [63]*Trinko*, 540 U.S. at 408 (noting that "[e]nforced sharing [ ] requires antitrust courts to
    act as central planners, identifying the proper price, quantity, and other terms of dealing," and
26  that courts are "ill-suited" for such a role).

27      [64]*See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-34 (9th Cir. 2004)
    (noting that dealing with a competitor only on unreasonable terms and conditions can amount to
28  a practical refusal to deal).

-18-

impacts the price or quality of MRO services generally.  Indeed, the evidence that

Honeywell has delayed shipments of replacement parts or withheld some technical

data, for whatever reason, does not show an anticompetitive effect.  Rather, it suggests

that Honeywell's conduct, even though possibly injurious to Aerotec, has a pro-

competitive effect on the market as a whole, because dissatisfaction with Honeywell's

ability to provide parts and data for repairs actually increases the demand for

alternatives to Honeywell-branded APU parts.

Aerotec argues the short-term pro-competitive effects will give way to long-term

anticompetitive effects.  Aerotec argues that Honeywell's actions in failing to provide

adequate parts service to independent MRO service providers in the parts market will

push independent repair firms, like itself, out of business, which will eventually allow

Honeywell to increase its market share in the MRO service market and permanently

increase prices and diminish quality of service.  There is no evidence to support

Aerotec's argument.  The evidence presented by Aerotec shows that at most Honeywell

has about a 50% share in the Honeywell APU repair market, which is insufficient to

establish that Honeywell threatens to obtain sufficient market power and then

permanently increase repair prices.[65]  Nothing in the record suggests that other MRO

service providers are also being pushed out by Honeywell's delays or parts allocation,

or that the competitive bidding process for MRO service on Honeywell APUs is failing

for lack of replacement parts or technical data.  Indeed, the evidence suggests

otherwise.  It is undisputed that there are at least forty-nine other MRO service

providers operating in competition with Honeywell for Honeywell APU repairs,[66] and that

these providers compete for service contracts through a bidding process.  It is also

undisputed that there is competition in the bidding process with at least four to five

---

[65]*See Eastman Kodak II*, 125 F.3d at 1206 (noting that a dominant share of the market often carries with it the power to control output and prices and that courts generally require a 65% market share to show dominant share).

[66]*See* doc. 138 at ¶ 9.

MRO service providers submitting bids for an airline's request for a repair contract proposal.

The evidence presented by Aerotec is limited to the effects felt by Aerotec. Aerotec argues that the negative effects on its business ultimately harm MRO service customers.  It points to evidence that its service customers find Aerotec's quality of service superior, but that evidence is irrelevant here.  Aerotec itself possesses a small share of the MRO service market (less than 1%); thus, the court cannot conclude that effects felt by Aerotec will have a meaningful impact on the market as a whole.

### 2. Bundled pricing

Aerotec also alleges that Honeywell violates Section 2 by offering bundled pricing of parts and repairs in its MRO service contracts.  Bundled pricing is "the practice of offering, for a single price, two or more good or services that could be sold separately.  A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the good or services purchased individually."[67]  Here, Aerotec argues that Honeywell bundles the cost of parts and labor, and because Honeywell is the manufacturer of parts, it can give customers a large discount on those parts when they use Honeywell's MRO services.  Honeywell argues that Aerotec's theory is really a price squeeze claim, whereby Aerotec complains that Honeywell raises prices of parts at the wholesale level to squeeze out competitors at the repair level who need those parts to compete.  Such claims are invalid if there is no duty to deal at the wholesale level and no predatory pricing at the retail level.[68]  Aerotec stresses that the focus of its bundling claim is not the higher prices Honeywell charges it at the wholesale level, but the discount that it offers MRO

---

[67]*Cascade Health*, 515 F.3d at 894.

[68]*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) ("If there is no duty to deal at the wholesale level and no predatory pricing at the retail level, then a firm is certainly not required to provide *both* of these services in a manner that preserves its rivals' profit margins.").

service customers at the retail level.  Both parties agree that issue turns on whether Honeywell engages in predatory pricing at the retail level.[69]

To show predatory pricing at the retail level, Aerotec must demonstrate that Honeywell engages in below-cost pricing.[70]  Honeywell has produced evidence to show that it has measures in place to make sure its MRO service contracts are priced above cost.[71]  Honeywell calculates gross marginal profit, the expected gross marginal profit as a percentage above marginal cost, profit before tax, return on sales, and net present value of cash flow to Honeywell.[72]  This evidence demonstrates that Aerotec cannot "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial."[73]

Aerotec argues that Honeywell's evidence is insufficient.  It argues that Honeywell has not actually disclosed its actual costs; rather. it simply provided a declaration and supporting financials without explaining how profit was calculated. Honeywell's evidence is sufficient in the court's view.  As noted by Honeywell, "Aerotec's vague suggestion that Honeywell could have provided even more data disproving Aerotec's allegations is just the sort of 'metaphysical doubt' that will not do."[74]  It is Aerotec's burden to demonstrate below-cost pricing.

Aerotec argues that it has put forth evidence of Honeywell's below-cost pricing. It points to a few examples of Honeywell's repair bids that end up being below cost

---

[69]Doc. 137 at p. 38.

[70]*Brooke Grp.*, 509 U.S. at 222 (noting that it is the plaintiff's burden to prove predatory pricing).

[71]Doc. 116 at ¶¶ 41-50 (and exhibits cited therein).

[72]Doc. 116 at ¶¶ 41, 43 (and exhibits cited therein).

[73]*Celotex,* 477 U.S. at 322.

[74]Doc. 142 at 10 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986)).

when the "discount attribution test" is applied.[75]  The discount attribution test was

adopted by the Ninth Circuit in *Cascade Health* to determine when a bundled discount

can be considered anticompetitive conduct in violation of Section 2.  Under this test, the

plaintiff must show that when the "full amount of the discounts given by the defendant

on the bundle are allocated to the competitive product or products, . . . the resulting

price of the competitive product or products is below the defendant's incremental cost

to produce them."[76]  The appropriate measure of "incremental cost" in a bundled

discount claim is the firm's marginal cost—defined as "the cost to produce one

additional unit and the price that would obtain in the market under conditions of perfect

competition"—or, if that amount cannot be inferred from the defendant's accounts, then

the appropriate measure can be average variable cost.[77]

Honeywell argues that the discount attribution test does not apply in this

situation.  It argues that *Cascade Health's* discount attribution test only applies in

situations where the rival does not sell as many products as the bundled discounter and

not in situations like the one presented here where every repair bid, whether made by

Honeywell or Aerotec, by nature includes "a bundle" of labor and component parts.  The

competitive product here is not just the labor, but the entire bundle of parts and labor.

Thus, Honeywell and Aerotec each offer the same "bundle" of parts and labor, and the

application of the discount attribution test makes little sense.  It further argues that the

application of the discount attribution test to the specific examples relied on by Aerotec

makes even less sense because it would cause the customer to pay substantially more.

As explained in detail in Honeywell's briefing, applying the discount attribution test here

would require Honeywell to increase the price of its repairs on the APU model at issue

[75]Doc. 107 at pp. 16-17.

[76]*Cascade Health*, 515 F.3d at 906.

[77]*Id.* at 909-10.

more than 200% and result in a minimum price that is actually well above Aerotec's average price for that very same repair.[78]

While the court finds Honeywell's arguments against the application of the discount attribution test persuasive, it need not make a determination about whether the test should actually apply.  Even applying the discount attribution test, Aerotec has not shown that Honeywell's pricing fails the test.  Aerotec used Honeywell's "pricing summary sheets" in its calculations.[79]  Those sheets list the *prices* for labor and parts that would be charged on a particular APU repair in the absence of an NTE or other MRO service agreement.[80]  These are prices, not costs.  As noted by Honeywell, the list price for APU parts is not equivalent to the cost of producing those parts.  If the list prices were equated to the cost, any level of discount offered by Honeywell would result in below-cost pricing.  Moreover, the discounts listed on pricing sheets do not reflect a specific discount off the price of parts or labor or a particular component of an APU repair job.  Rather, it is the discount applied to the job as a whole that is needed to meet the terms of the NTE agreement that the customer has with Honeywell.[81]  Aerotec has not provided any other evidence that Honeywell prices its MRO services below cost, and thus its bundled pricing claim against Honeywell fails.

**C. Price Discrimination**

In addition to the Sherman Act claims, Aerotec brings a price discrimination claim under the Robinson-Patman Act.[82]  It argues that Honeywell charges non-affiliated MRO service providers, such as itself, an automatic 15% premium for component parts and that such discrimination between Honeywell affiliates and non-affiliates has

_____

[78]Doc. 122 at pp. 13-14.

[79]Doc. 108 at ¶ 131; Doc. 108-13 (Ex. 117).

[80]Doc. 123 at ¶ 131; Doc. 116 at ¶¶ 38-40; Doc. 116-1 (Ex. 1).

[81]Doc. 116 at ¶ 38; Doc. 116-1 (Ex. 1).

[82]15 U.S.C. § 13(a).

1   anticompetitive effects.  The Robinson-Patman Act "does not ban all price differences

2   charged to different purchasers of commodities of like grade and quality; rather, the Act

3   proscribes price discrimination only to the extent that it threatens to injure

4   competition."[83]  In cases such as this one where the plaintiff asserts that the price

5   difference inhibits its ability to compete with the favored purchasers, the plaintiff must

6   demonstrate that (1) the relevant sales were made in commerce; (2) the product sold

7   was of "like grade and quality"; (3) the seller discriminated in price as between

8   purchasers; and (4) the discrimination had a negative effect on competition.[84]

9        Aerotec alleges that both airline customers and affiliated MRO service providers

10  receive the benefit of Honeywell's price discrimination because they are offered

11  Honeywell's catalog prices without a premium.  It does not point to specific instances of

12  price discrimination but generally asserts that it has to pay 15% above Honeywell's

13  catalog prices while affiliates and airlines receive the catalog prices or lower.

14       Aerotec cannot base its price discrimination claim on the different prices offered

15  to airline customers who buy component parts from Honeywell and then perform their

16  own APU repairs because there is no competitive injury involved.  To the extent those

17  airlines do not bid for other MRO service contracts, they operate on a different level

18  than Aerotec and are not competitors.[85]  Aerotec is not entitled to the same prices that

19  Honeywell charges the airline customers.

20

21

22

23  [83]*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006) (internal quotations and citations omitted).

24  [84]*Id.*

25  [85]*See Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191,197, 203-05 (3d Cir. 2010) (no

26  competitive injury demonstrated where the supplier charged distributors higher prices than those charged to direct customers); *O'Byrne v. Cheker Oil Co.*, 530 F.Supp. 70, 71 (N.D. Ill.

27  1981) (holding that sales to distributors at higher prices than direct sales to consumers were not actionable because consumers did not re-sell the product therefore do not compete with

28  distributors).

1    Aerotec's claim that Honeywell improperly discriminates in favor of affiliated

2   MRO service providers also fails because of the fact that affiliates deal with Honeywell

3   on terms set forth in complex, long-term contracts.  Affiliates often receive lower prices

4   on specific parts because of the terms in their affiliate agreements.  In such situations,

5   the affiliates' dealings with Honeywell are not reasonably comparable to those of non-

6   affiliates who only make purchases from Honeywell on the spot.[86]  "A seller is not

7   obligated to charge the same prices for a commodity if its sales contracts with different

8   buyers contain materially different terms."[87]  Sales made on a purchase-to-purchase

9   basis and sales made in conjunction with a long-term contract reflect different market

10   conditions justifying cost differences.[88]

11    Honeywell puts forward evidence to demonstrate that the "favored" affiliated

12   MRO service providers are parties to agreements with Honeywell that are materially

13   different from the purchase-to-purchase agreements Aerotec has with Honeywell.[89]

14   The affiliate agreements place obligations on those MRO service providers—such as

15   royalty payments, restrictions on PMA parts, training requirements, and audits—that are

16   not imposed on Aerotec when it purchases parts.  Honeywell benefits from the

17   obligations in these agreements and, as a result, often compensates those affiliates in

18   the form of negotiated or discount pricing for certain parts.

19    Aerotec argues that spot sales and long-term contracts should only be

20   considered materially different if those long-term contracts actually set a negotiated set

21

22

23    [86]Doc. 116 at ¶¶ 19-20 (and exhibits cited therein).

24    [87]*Coalition for a Level Playing Field, LLC v. Autozone, Inc.*, 813 F.  Supp.  2d 557, 566
     (S.D.N.Y 2011); *see also Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,*  990 F.2d

25   25, 27 (1st Cir. 1993) (suggesting but not deciding that high-priced purchases on the spot
     market and sales under a long-term contract are not reasonably contemporaneous); 14 Areeda

26   & Hovenkamp, *supra* note 19, ¶2313d at 37-38.

27    [88]*Coastal Fuels*, 990 F.2d at 27.

28    [89]Doc. 116 at ¶¶ 17, 20-23 (and exhibits cited therein).

1   selling price for the product at issue.  In those situations, long-term contracts reduce

2   both parties' exposure to changes in the market price of a commodity and thus reflect

3   different market conditions.  Aerotec points to evidence set forth in its contravening

4   statement of facts to argue that Honeywell does not actually negotiate pricing in its

5   affiliate contracts and that affiliates do not receive a long-term price discounts, but

6   instead pay whatever the catalog prices may be at the time of the order and without any

7   additional premium.[90]  Thus, it argues the rationale for treating spot sales and long-term

8   contract sales differently is not present here.  That evidence, however, is effectively

9   rebutted by Honeywell.  Honeywell presents evidence to show that the document

10   Aerotec relies upon is not part of an affiliate agreement but rather is a form used for

11   routine purchase orders.[91]  Indeed, the document referenced by Aerotec is not linked to

12   an affiliate agreement, and regardless, the document states that its provisions are

13   superceded by any agreement between the buyer and Honeywell that has different

14   terms.  A close review of the sample affiliate agreements provided by Honeywell

15   demonstrates that they do vary and that they do offer selected discount pricing or

16   negotiated pricing in exchange for undertaking certain obligations.[92]  Thus, when an

17   affiliate buys a part from Honeywell at a discount, it is part of a larger negotiated

18   agreement.  As stated by Honeywell in its briefing, "it would distort both the Robinson-

19   Patman Act and the competitive process generally if Aerotec could use the [Act] to

20   obtain the benefits of Honeywell's agreements with its [affiliates] – i.e., selected

21   discounts on pricing of repair parts–without being subject to the obligations these

22   agreements impose upon the [affiliates]."[93]  Aerotec presents no evidence to show that

23

24        [90]Doc. 138 at ¶141 (Ex. G).

25        [91]Doc. 142-1.

26        [92]Doc. 116 at ¶ 20.  *See, e.g.,* doc. 116-3 at p. 39 (Ex. 17); doc. 116-4 at pp. 43, 52
27   (Ex. 21); doc. 116-5 at pp. 6, 53; doc. 116-6 at p. 7.

28        [93]Doc. 115 at p. 44.

1   an affiliate generally receives a special discount or lower prices when that discount is

2   not provided for in its affiliate agreements with Honeywell.

3   **D. State Law Claims**

4           Plaintiff pled several state law claims.  The Sixth Claim is for violation of the

5   Arizona antitrust laws.  That claim must be dismissed for the same reasons that

6   summary judgment is appropriate on all of the federal antitrust claims.[94]

7           The Seventh and Eighth Claims allege tortious interference, which under state

8   law requires a showing that the defendant's interfering conduct was both intentional and

9   improper.[95]  As Aerotec concedes, the success of these claims depends upon the

10  outcome of its federal antitrust claims, because Aerotec relies on Honeywell's violation

11  of antitrust law to establish the requisite improper conduct.[96]  Thus, its tortious

12  interference claims must be dismissed for the same reasons that summary judgement

13  is appropriate on all of the federal antitrust claims.

14          Aerotec's Ninth Claim alleges Honeywell published injurious falsehoods

15  regarding Aerotec in order to prevent customers from doing business with it in violation

16  of state law.  In order to establish a claim for injurious falsehood, Aerotec must show

17  that Honeywell published false information that is "derogatory to [its] business" and

18  "calculated to prevent others from dealing with [Aerotec]."[96]  Honeywell argues that

19  there is no admissible evidence in the record to establish a genuine issue of fact

20  regarding this claim.  The only evidence Aerotec relies on in support is an email from

21

22  _____

23  [94]*Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 106 (Ariz. 2003) (en banc) (noting that when interpreting Arizona's antitrust statute, Arizona courts "follow[ ] federal law in determining the standard of conduct required by antitrust law").

24

25  [95]*Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1026 (Ariz. 2005) (en banc).

26  [96]Doc. 137 at p. 44 (conceding that its tortious inference claims "live or die based on [its] federal antitrust claims").

27

28  [96]*Aldabbagh v. Ariz. Dep't of Liquor Licenses and Control,* 783 P.2d 1207, 1213 (Ariz. Ct. App. 1989).

1   one Aerotec employee to another Aerotec employee, wherein that employee states that

2   an airline customer's employee told him that Honeywell employees had made negative

3   comments about Aerotec's financial situation.[97]  The email is a second-hand account of

4   Honeywell employees saying something negative about Aerotec, and the email is being

5   offered to prove the truth of the matter asserted therein—that Honeywell said

6   something false and negative about Aerotec.  The email is inadmissible hearsay.[98]

7   Aerotec argues that it is premature to consider the admissibility of the email and that

8   there may be an applicable exception to the hearsay rule, but it fails to explain what that

9   exception may be and why that exception would apply.  Moreover, the court can only

10  consider admissible evidence in ruling on a motion for summary judgment.[99]  Aerotec

11  has failed to present any admissible evidence that Honeywell made injurious

12  statements regarding Aerotec; Aerotec did not submit a declaration or deposition

13  testimony from a person who has first-hand knowledge of disparaging statements made

14  by Honeywell, nor did it submit Honeywell documents containing disparaging remarks

15  about Honeywell.  Thus, summary judgment in favor of Honeywell on this claim is

16  warranted.

17          The Tenth Claim alleges that Honeywell violated Arizona's Consumer Fraud

18  statute.  The statute makes it illegal to engage in any "deception, deceptive or unfair act

19  or practice, fraud, false pretense, false promise, misrepresentation, or concealment,

20  suppression or omission of any material fact with intent that others rely on such

21  concealment, suppression or omission, in connection with the sale or advertisement of

22  any merchandise, whether or not any person has in fact been misled, deceived or

23

24

25          [97]Doc. 116 at ¶ 136; Doc. 116-11 (Ex. 103).

26          [98]Fed. R. Evid. 801, 802.

27          [99]*See* Fed. R. Civ. P. 56(e); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir.

28  2002).

1  damaged thereby."[100]  Aerotec asserts that Honeywell has violated this statute on many
2  occasions when it failed to deliver parts in a timely manner as promised.  Honeywell
3  argues that the majority of this claim is based on instances that occurred in 2007 and
4  early 2008, and therefore are time-barred under Arizona law.[101]  In reply, Aerotec
5  asserts that some of Honeywell's allegedly deceptive actions fall within the limitations
6  period.  It points to evidence regarding an APU part Aerotec ordered and paid for in
7  2012 but did not receive for more than a year.[102]  Honeywell argues that nothing in the
8  evidence Aerotec relies upon shows Honeywell made any false promise or
9  misrepresentation about delivery, because estimated delivery times are explicitly
10 subject to change.  After review of the evidence, the court concludes that Aerotec has
11 not adequately shown that Honeywell violated the consumer fraud statute.  The
12 evidence Aerotec relies upon does not create a disputed fact as to whether Honeywell
13 was actually deceptive in relation to Aerotec's 2012 order, rather than just negligent or
14 incompetent.  Aerotec argues that there is a question of fact generally about whether
15 the reason given for Honeywell's delay was legitimate, but the legitimacy of any delays
16 are irrelevant: to succeed on this claim.  Aerotec must point to some evidence of a false
17 promise, affirmative representation, or intentional concealment or omission on
18 Honeywell's part to support such a claim.  It fails to do so.

19
20
21
22
23
24
25

26  [100] A.R.S. § 44-1522(A).

27  [101]A.R.S. § 12-541(5).

28  [102]Doc. 108 at ¶¶ 90-95; Doc. 108-13 (Ex. 76).

1

**V.  CONCLUSION***

2

Based on the preceding discussion, Plaintiff's motion for summary judgment at

3

docket 107 is **DENIED**.  Defendant's motion for summary judgment at docket 115 is

4

**GRANTED**.  The clerk will please enter judgment for Defendant.

5

DATED this 14th day of March 2014.

6

/s/

7

JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

* This amended order and opinion corrects the docket numbers associated with the

27

parties' motions.

28

-30-